ESTATE OF HARRY B. SIDLES, DECEASED, DANIEL J. MONEN, JR., AND JANICE P. SIDLES, CO-EXECUTORS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6563-73.    Filed January 29, 1976.

*William E. Seidler* and *John J. Gross,* for the petitioners.
*Ronald M. Frykberg,* for the respondent.

OPINION

DAWSON, *Chief Judge:* Respondent determined deficiencies of $160,203 and $2,197 in petitioners' Federal income taxes for the taxable years ended May 31, 1969, and May 31, 1970, respectively.

Some issues have been conceded by petitioners. The primary issue for our decision is whether a liquidating distribution received by the Estate of Harry B. Sidles from Bi-State Distributing Corp. constituted "income in respect of a decedent" within the meaning of section 691(a)(1).[1] If this distribution is

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

determined to be "income in respect of a decedent," then we must. decide whether the deduction provided by section 691(c) is to be offset only against section 691(a) income.

All of the facts are stipulated. The stipulation of facts and the exhibits attached thereto are adopted as our findings. The relevant facts are summarized below.

Harry B. Sidles (herein referred to as the decedent) was born on May 2, 1903, and died testate in Omaha, Nebr., on June 12, 1968. During his lifetime the decedent was a cash basis taxpayer.

Daniel J. Monen, Jr., and Janice P. Sidles, the petitioners herein, are the duly appointed and qualified coexecutors of the Estate of Harry B. Sidles (herein referred to as the estate). When the petition was filed herein the legal residence of Daniel J. Monen, Jr., was Omaha, Nebr., and that of Janice P. Sidles was Scottsdale, Ariz.

The estate's fiduciary income tax return (Form 1041) for the taxable year beginning June 12, 1968, and ending May 31, 1969, was filed with the Internal Revenue.Service Center at Kansas City, Mo. Subsequently, two amended returns were filed for that year. The estate's fiduciary income tax return for the taxable year ending May 31, 1970, was filed with the District Director of Internal Revenue at Omaha, Nebr.

Bi-State Distributing Corp. (herein referred to as Bi-State) was originally incorporated under the laws of Nebraska in 1930 as the H.E. Sidles Co. On October 17, 1947, the name of the corporation was changed to Bi-State Distributing Corp.

From January 3, 1956, until his death on June 12, 1968, the decedent owned all the outstanding common stock (500 shares) of Bi-State. At his death decedent's adjusted basis in these shares was $29,701.04.

As of June 12, 1968, Bi-State's board of directors consisted of three individuals: the decedent (nominated and elected January 20, 1933), Janice P. Sidles (nominated and elected on January 3, 1956), and Areta L. Kelly (nominated and elected on June 26, 1962). Janice P. Sidles and Areta L. Kelly were the decedent's wife and mother-in-law, respectively. On July 22, 1968, Margaret DeVore was nominated and elected to serve the balance of the decedent's term as a director. She was an employee of Bi-State and was not related to the decedent or to either of the other two directors.

At a special meeting held on February 28, 1968, Bi-State's board of directors adopted a plan of complete liquidation and dissolution pursuant to section 337 of the Internal Revenue Code of 1954, and section 21-2083 of the Nebraska Business Corporation Act. On the same day this plan of complete liquidation was approved by the decedent as Bi-State's sole shareholder.

On February 29, 1968, Bi-State filed with the Nebraska secretary of state a statement of intent to dissolve.

Bi-State owned 11,025 shares of Sidles Co. stock. On March 26, 1968, Sidles Co. made an offer to purchase these shares. The purchase agreement provided that Bi-State would receive cash of $13,429 and a 20-year, 6-percent promissory note from Sidles Co. in the face amount of $899,000. On the same day Bi-State accepted this purchase offer. Bi-State's basis in the 11,025 shares of Sidles Co. stock at the time of sale was $86,344.84.

Bi-State owned certain real and personal property at 4827 Dodge Street in Omaha, Nebr., and from November 1964 until November 1968 was actively engaged in the operation of a gift shop, Areta's, at that location. The gift shop was managed by Areta L. Kelly, decedent's mother-in-law.

After the decedent's death, Bi-State took no action to distribute any of its assets pursuant to the previously adopted plan of liquidation until November 29, 1968, when its board of directors adopted a resolution to distribute all its real and personal property to the decedent's estate. On that date a warranty deed, transferring the real property located at 4827 Dodge Street, and a bill of sale, transferring the personalty to the estate, were executed.

On November 30, 1968, Bi-State assigned all its right, title, and interest in the Sidles Co. promissory note to the estate.

As of the dates of distribution, November 29 and 30, 1968, the assets distributed in liquidation by Bi-State to the estate had a total net fair market value of $702,830.85, being the total fair market value of assets received ($731,195.88), less liabilities assumed ($28,365.03).

Articles of dissolution were executed by Bi-State on November 30, 1968, and were filed with the Nebraska secretary of state on December 17, 1968. On December 17, 1968, a certificate of dissolution was issued.

At the time Bi-State adopted its plan of liquidation and dissolution, which was by act of the corporation, section 21-2088,

Nebraska Business Corporation Act, provided the procedure for the corporate revocation of voluntary dissolution proceedings.[2]

Pursuant to the provisions of section 337, Bi-State did not recognize its gain on the sale of its assets in liquidation, i.e., the gain on the sale of its Sidles Co. stock, less a $204 loss on the sale of a 1968 Buick station wagon.

On the decedent's Federal estate tax return, the executors included the 500 shares of Bi-State stock at a value of $702,830.85, valued as of the alternate valuation date (November 30, 1968). This valuation was accepted by respondent following an audit.

In his notice of deficiency dated June 12, 1973, respondent determined that the gain realized from the liquidation of Bi-State constituted income in respect of a decedent. The gain ($673,129.81) was calculated by subtracting the decedent's adjusted basis in his Bi-State stock ($29,701.04) from the net fair market value of the assets received by the estate as a liquidating distribution ($702,830.85). The respondent further determined that a deduction of $950 for the taxable year ending May 31, 1969, for Federal estate tax attributable to income in respect of a decedent, as claimed by petitioners, was not allowable, but that an estate tax deduction of $94,448 was

---

[2] This section reads in relevant part:

By the act of the corporation, a corporation may, at any time prior to the issuance of a certificate of dissolution by the Secretary of State, revoke voluntary dissolution proceedings theretofore taken, in the following manner:

(1) The board of directors shall adopt a resolution recommending that the voluntary dissolution proceedings be revoked, and directing that the question of such revocation be submitted to a vote at a special meeting of shareholders;

(2) Written or printed notice, stating that the purpose or one of the purposes of such meeting is to consider the advisability of revoking the voluntary dissolution proceedings, shall be given to each shareholder of record entitled to vote at such meeting within the time and in the manner provided [in this act] for the giving of notice of special meetings of shareholders;

(3) At such meeting a vote of the shareholders entitled to vote thereat shall be taken on a resolution to revoke the voluntary dissolution proceedings, which shall require for its adoption the affirmative vote of the holders of at least two-thirds of the outstanding shares; and

(4) Upon the adoption of such resolution a statement of revocation of voluntary dissolution proceedings shall be executed by the corporation by its president or a vice president and by its secretary or an assistant secretary, which statement shall set forth:

(a) The name of the corporation;

(b) The names and respective street addresses of its officers;

(c) The names and respective street addresses of its directors;

(d) A copy of the resolution adopted by the shareholders revoking the voluntary dissolution proceedings;

(e) The number of shares outstanding; and

(f) The number of shares voted for and against the resolution, respectively.

allowable as an offset against income in respect of a decedent totaling $674,708 in computing the alternative tax. It was further determined that for the taxable year ending May 31, 1970, the proper deduction for Federal estate tax attributable to income in respect of a decedent was $255, rather than $686 as claimed on the return.

Petitioners contend that the liquidating distribution received by the estate from Bi-State is not governed by section 691(a) and, even if it did constitute income in respect of a decedent, the deduction provided by section 691(c) should not be limited solely to section 691(a) income items.

The principal issue is whether the liquidating distribution received by the estate from Bi-State constituted "income in respect of a decedent" as that term is used in section 691, which provides, in relevant part, that:

The amount of all items of gross income in respect of a decedent which are not properly includible in respect of the taxable period in which falls the date of his death or a prior period (including the amount of all items of gross income in respect of a prior decedent, if the right to receive such amount was acquired by reason of the death of the prior decedent or by bequest, devise, or inheritance from the prior decedent) shall be included in the gross income, for the taxable year when received, of:

(A) the estate of the decedent, *if the right to receive* the amount is acquired by the decedent's estate from the decedent; [Emphasis added.]

Section 1.691(a)-1(b), Income Tax Regs., defines "income in respect of a decedent" as:

those amounts to which a decedent was *entitled* as gross income but which were not properly includible in computing his taxable income for the taxable year ending with the date of his death or for a previous taxable year under the method of accounting employed by the decedent. * * * [Emphasis added.]

Respondent determined that the liquidation proceeds were income in respect of the decedent because, as of the date of his death, the decedent was entitled to and possessed the right to receive the liquidating distribution from Bi-State.

Petitioners argue that the criterion for determining whether an item constitutes "income in respect of a decedent" within the meaning of the Code and regulations sections quoted above is that the decedent must be entitled to the item in the sense that he had a right to the income at the time of his death, which right had been earned during his lifetime. Petitioners further contend that neither the adoption of the plan of liquidation nor

decedent's activities or economic efforts created the requisite right to income under section 691 and the regulations thereunder. They argue that the decedent had no right and was not entitled to the liquidation proceeds until the distribution had been authorized by Bi-State's board of directors.

Income in respect of a decedent is defined only in the regulations and not in the statute. An attempt to add such a definition to the Code in 1959 failed. H.R. 3041, 86th Cong., 1st Sess. (1959). However, some guidelines can be gleaned from an examination of congressional intent as reflected in the legislative history of section 691 and its antecedents.

Prior to 1934 an accrual basis taxpayer was required to pay income tax on those amounts accrued but not received as of the date of his death. However, neither a cash basis taxpayer nor his estate was required to pay a Federal income tax on such amounts because they were considered corpus rather than income. *Nichols v. United States,* 64 Ct. Cl. 241 (1927), cert. denied 277 U.S. 584 (1928). Furthermore, no income tax liability arose when capital assets were transferred after death since the estate's basis in such assets was fair market value at date of death and the amounts received generally did not exceed this amount.[3]

Congressional concern with this discrimination between taxpayers and loss of revenue led to the enactment of section 42 of the Revenue Act of 1934. This section required all income accrued to the date of death but not otherwise properly includable in income for that period or any prior period to be included in decedent's income tax return for the period ending with his death regardless of his method of accounting. See S. Rept. No. 558, 73d Cong., 2d Sess. 28 (1934).

While this section achieved an equality between cash and accrual basis decedents, it resulted in bunching of income since amounts which would have been received over several years and taxed at lower rates were required to be reported in the year of death. This situation was aggravated by the imposition of war surtaxes and by the realization that taxpayers might be taxed on substantial sums which they had not yet received or might never receive. See S. Rept. No. 1631, 77th Cong., 2d Sess. 100-105

---

[3] Under present law, sec. 1014(c) provides that the general rule of sec. 1014(a) that the basis of property acquired from a decedent shall be the fair market value of the property on the date of the decedent's death, "shall not apply to property which constitutes a right to receive an item of income in respect of a decedent under section 691."

(1942), 1942-2 C.B. 504, 579-583. Furthermore, the decision of the Supreme Court in *Helvering v. Enright,* 312 U.S. 636 (1941), greatly expanded the meaning of "accrued" as used in section 42. In that case, the Supreme Court, after giving the reasons for the enactment of section 42, explained that it was endeavoring to effectuate the legislative objective of ensuring that income, which would have been taxable had decedent lived to receive it, should not escape income taxation by reason of his death.

Accruals here are to be construed in furtherance of the intent of Congress to cover into income the assets of decedents, earned during their life and unreported as income, which on a cash return, would appear in the estate returns. Congress sought a fair reflection of income. [312 U.S. at 644-645.]

Section 134 of the Revenue Act of 1942 added section 126 of the 1939 Internal Revenue Code. This section, the predecessor of section 691 of the Internal Revenue Code of 1954, eliminated the undesirable pyramiding effects of the prior law through formulation of the concept of "income in respect of a decedent." Under this section income accruing to a decedent because of his death was not to be included in his final return, but was to be treated as income and reported as such by the person receiving such income. As noted in *Commissioner v. Linde,* 213 F. 2d 1, 5-6 (9th Cir. 1954), cert. denied 348 U.S. 871 (1954):

there is nothing in the legislative history or in the text of Sec. 126 to indicate that it was intended to be anything other than an improved device to accomplish the general purpose of the internal revenue code that all income should pay a tax and that death should not rob the United States of the revenue which otherwise it would have had. We think it clear that the intent of Congress continued to be as stated in the Enright case "to cover into income the assets of decedents, earned during their life and unreported as income". * * * [Fn. ref. omitted.]
          * * *
it is our view that section 126 was but an improved method adopted by Congress in aid of its continuing effort to avoid the loss of tax upon income merely because of the death of the decedent who would have paid a tax upon the same economic returns had he lived to receive them.

Section 691 includes in gross income "all items of gross income in respect of a decedent which are not properly includible" in the taxable year ending with the date of his death or prior period. This reflects the same general congressional intent to tax all items which can constitutionally be considered income, but which are not exempted from taxation, as that underlying section 61 which defines gross income. However, for income to be

considered "income in respect of a decedent," section 691 requires that the decedent possess a right to that income as of his date of death.[4] This is a question of fact and each case depends upon its "subsisting facts." *Trust Co. of Georgia v. Ross*, 392 F. 2d 694, 695 (5th Cir. 1967), cert. denied 393 U.S. 830 (1968). One of the factors to be considered is whether the income received after death resulted from the decedent's activities and economic efforts during his lifetime.[5] But this right must be distinguished from the activity which created it. No matter how great the activity or effort, there can be no income in respect of a decedent under section 691 unless the decedent possessed a right to receive such income on his date of death. *Trust Co. of Georgia v. Ross, supra* at 695. Our point of inquiry must be whether the transaction had sufficiently matured as of decedent's death so as to create in him a right to receive the income when it was subsequently realized.

The facts and circumstances of this case lead us to the conclusion that the amounts received by the decedent's estate on the liquidation of Bi-State constituted income in respect of a decedent within the meaning of section 691.

On February 28, 1968, the board of directors of Bi-State Distributing Corp., consisting of Harry B. Sidles, Janice P. Sidles, and Areta L. Kelly, passed a resolution calling for the complete liquidation and dissolution of the corporation. The sole

---

[4] It is clear that the determination of whether a right or entitlement existed is to be made at the date of decedent's death.

See *Keck v. Commissioner,* 415 F. 2d 531, 535 (6th Cir. 1969), revg. 49 T.C. 313 (1968):

"It is our conclusion that, *at the date of his death,* decedent * * * possessed neither the right nor the power to require the corporations to liquidate and did not, *prior to his death,* possess the right to receive any proceeds from the contemplated liquidation. It follows that the amounts herein involved are not taxable under Section 691. [Emphasis added.]"

and *Trust Co. of Georgia v. Ross,* 392 F. 2d 694, 696 (5th Cir. 1967), cert. denied 393 U.S. 830 (1968):

"It is implicit in the statute and in the definition that this condition or limitation has reference *to the date of death* of the decedent. That is, *income is to be included if decedent was entitled to the income at the date of his death.* * * * [Emphasis added.]"

Whatever actions the estate or Bi-State's board of directors could have taken after decedent's death are not material here. Therefore, the assignment-of-income cases, where the courts considered whether the transferees had power to revoke the plan of liquidation, cited by petitioners' counsel, are inapposite.

[5] For additional factors see *Davison's Estate v. United States,* 155 Ct. Cl. 290, 292 F. 2d 937, 941-942 (1961); *Commissioner v. Linde,* 213 F. 2d 1, 4 (9th Cir. 1954); Ferguson, Freeland & Stephens, Federal Income Taxation of Estates and Beneficiaries 146-148 (1st ed. 1970).

stockholder of Bi-State, Harry B. Sidles, approved the resolution that same day.

The liquidating distribution had its source exclusively in decedent's actions. His affirmative vote for liquidation created a right to receive that distribution, which right existed at his death. Although decedent had the power to rescind the transaction creating such a right, he had not attempted to do so before his death. Had the decedent lived to receive the liquidating distribution, it would have constituted income to him, and consequently such amounts constitute income in respect of a decedent when received by the estate.

There can be no doubt that the estate acquired the right to receive the liquidation distribution from the decedent. The estate's right to such proceeds derived solely from decedent's death and not from its own efforts. Whatever actions the estate took were of no material significance here.

Furthermore, the actions of Bi-State's board of directors which remained to be done at the time of decedent's death do not derogate decedent's right to receive the liquidating distribution. The resolution of November 29, 1968, to distribute the assets in liquidation to decedent's estate, the declaration of the liquidating dividend and the filing of articles of dissolution were mere formalities; ministerial acts necessary to complete the liquidation under State law. On the date of his death the decedent had performed enough substantive acts within his control to perfect his right to receive the liquidating distribution for purposes of section 691.[6] Cf. *Hudspeth v. United States,* 471 F. 2d 275 (8th Cir. 1972); *Kinsey v. Commissioner,* 477 F. 2d 1058 (2d Cir. 1973), affg. 58 T.C. 259 (1972).

In *Keck v. Commissioner,* 415 F. 2d 531 (6th Cir. 1969), revg. 49 T.C. 313 (1968), the Commissioner determined a deficiency in the income tax of George W. Keck and Mary Ann Keck, and also asserted transferee liability against Mary Ann Keck, as transferee of the assets of the Estate of Arthur D. Shaw, deceased.

---

[6] Although the decedent's right to the liquidating distribution at his death was an absolute and unconditional one, it should be noted that sec. 1.691(a)-1(b)(3), Income Tax Regs., provides that income to which the decedent had a "contingent claim" at the time of his death is sufficient to create income in respect of a decedent. See also Rev. Rul. 60-227, 1960-1 C.B. 262, 263.

Further, it has been held that the requisite right need not be a legally enforceable one, *O'Daniel's Estate v. Commissioner,* 173 F. 2d 966 (2d Cir. 1949), but merely free from contingencies, *Estate of Nilssen v. United States,* 322 F. Supp. 260, 264-265 (D.Minn. 1971).

The issue there was whether certain amounts received in 1960 by Mary Ann Keck and by the estate, were taxable as income in respect of a decedent under section 691. The deceased, Arthur D. Shaw, owned stock in three affiliated corporations as of March 1, 1956. On that date an agreement was entered into prior to the sale of the assets of the corporation. The sale, however, was contingent upon approval of the Interstate Commerce Commission. The shares of stock were placed in escrow pending such approval.

Mr. Shaw died November 27, 1958. ICC approval was not obtained until May 5, 1960. On July 21, 1960, pursuant to authority granted by the ICC, the three companies were liquidated pursuant to the agreement earlier agreed upon, and the cash received from the sale was distributed in exchange for shares of the stock of the three companies. The executor of the Estate of Mr. Shaw paid over to Mrs. Keck $314,328.53 in exchange for 100 shares of one of the companies liquidated. The court there held that at the time of the decedent's death, his stock had not been converted into section 691 income in respect of a decedent. The Court of Appeals agreed with the dissenting opinion of Judge Featherston in *George W. Keck,* 49 T.C. 313 (1968), that the sale was subject to a number of contingencies which operated to prevent the cash from becoming income in respect of a decedent: (1) The sale was subject to approval of the ICC, which approval did not come until 18 months after decedent's death; (2) as of the time of decedent's death, neither decedent nor the other stockholders were contractually committed to the plan to liquidate the corporation; (3) the majority stockholder (who in this case was not decedent) might have decided not to liquidate the corporation; and (4) the decedent's own stock was not committed to vote for the plan until May 23, 1960, when the proxies were signed and delivered.

The *Keck* case is clearly distinguishable on its facts. Unlike *Keck,* the decedent, as Bi-State's sole shareholder, possessed the power to compel payment of the liquidating distribution, as well as the right to that payment, when he died. His right to the liquidation distribution was not subject to the many contingencies involved in *Keck.* The transaction was not subject to the approval of any Government agency; there was no other stockholder who could vote not to liquidate the corporation. The distribution made to the Estate of Harry B. Sidles, was clearly

"income in respect of a decedent" within the meaning of section 691.

The second issue we must decide is whether the estate tax deduction provided in section 691(c) can be offset only against related section 691(a) items. Petitioners argue that the 691(c) deduction is not limited to deductions from or offsets against income items in respect of a decedent but may be used in the way that is most advantageous to them. They have first taken the 691(c) deduction against ordinary income (which was not income in respect of a decedent) and then applied the remainder against the capital gain income in respect of a decedent which engendered the deduction.

Section 691(c) provides that when a taxpayer includes an amount of "income in respect of a decedent" in his gross income, he "shall be allowed" a deduction. This deduction is limited to the portion of the estate tax imposed upon the decedent's estate which is attributable to the inclusion of that amount of income in respect of a decedent in the decedent's gross estate. Sec. 691(c)(1)(A). Neither the statute nor its legislative history expressly restricts the 691(c) deduction to 691(a) income items. The purpose for providing this deduction was to prevent subsequent income taxation of an item of income in respect of a decedent which had already been taxed for estate tax purposes. S. Rept. No. 1622, 83d Cong., 2d Sess. 87-89 (1954); H. Rept. No. 1337, 83d Cong., 2d Sess. 64-65 (1954).

Based on our conclusion on the first issue, the estate had income in respect of a decedent of $674,708. The estate tax attributable to the income in respect of a decedent (and thus the amount of the section 691(c) deduction) was $94,448. The estate also had other taxable income for 1969 of $29,284. It took the 691(c) deduction first against ordinary income, and, after completely using that amount, took the remaining deduction as an offset against capital gains before making the alternate tax computation provided by section 1201(b).

In his statutory notice of deficiency the respondent allowed the 691(c) deduction only as an offset against the 691(a) items (capital gain) and not from ordinary income. Respondent's computation in the notice of deficiency was as follows:

| Income in respect of a decedent[1] | | $674,708 |
|---|---|---|
| Less net estate tax in respect of a decedent | | 94,448 |
| Balance, long-term capital gain | | 580,260 |
| Capital gain tax rate | | 25% |
| Capital gain tax | | 145,065 |
| Tax on other income of estate: | | |
| Taxable income, per amended return and with sec. 691(c) deduction added back in: | $29,284 | |
| Tax on $29,284 | | 10,771 |
| Total tax | | 155,836 |

[1] This consists of $673,130 realized on the liquidation of Sidles Co. and $1,578 from a note receivable of the Sidles Co.

Petitioners' method results in a tax savings because the deduction was first taken against ordinary income, which is taxable at a higher rate than the capital gains.

Respondent relies on *Read v. United States,* 320 F. 2d 550 (5th Cir. 1963). In that case the income in respect of a decedent consisted of long-term capital gain against which the estate offset the section 691(c) deduction before computing the alternative tax. The Government argued that the 691(c) deduction must be taken against ordinary income and could not be offset against capital gains because "there is no express provision making the deduction applicable in alternative tax computations," *Read v. United States, supra* at 552. In other words, a deduction is not an offset. The Court of Appeals for the Fifth Circuit found for the estate, reversing the decision of the District Court and remanding the case. It noted that the adoption of the Government's position would result in the imposition of both estate and income tax on amounts of income with respect to a decedent where the alternative computation was used, contrary to the congressional intent in enacting section 691(c). The court also referred, at page 553, to the legislative history which noted that recipients of income in respect of decedent are to be "allowed an offsetting deduction" for the estate tax attributable to the inclusion of income in respect of a decedent in the decedent's gross estate, citing S. Rept. No. 1622, 83d Cong., 2d Sess. 87 (1954).

In *Read,* the 691(c) deduction obviously exceeded the amount of ordinary income and would have been lost unless it could be offset against the capital gain income in respect of a decedent item. The Government's position would have forced the estate to

forego the alternative tax in order to fully utilize the 691(c) deduction.

The Court of Appeals, after allowing the offset, noted that:

The offsetting is a *pro tanto* cancelling out. It works a reduction *in the* amount of the *particular kind of income which is to be subject to taxation.* There is equal purpose to be served and a like reason for allowing the deduction where the alternative tax computation is used as where it is not. * * * [*Read v. United States, supra* at 553; emphasis added.]

Respondent argues that this language requires us to sustain his position in this case because this will result in a proper matching of the deduction with its related income consistent with congressional intent.

We do not find *Read* to be on point because the holding in that case was that the 691(c) deduction could be used as an offset where the alternative tax is used. Respondent does not dispute petitioners' right to an offset here.

The issue confronting us in this case was not before the court in *Read* and, accordingly, we have only considered those portions of that case which discussed the statutory purpose of section 691(c). Furthermore, we think that the failure of the estate in *Read* to use the section 691(c) deduction in the most advantageous way should not be deemed to be a conclusive determination that the credit must be offset solely against income in respect of a decedent.

The scope of the 691(c) deduction has been explored in three subsequent cases. *Meissner v. United States,* 364 F. 2d 409 (Ct. Cl. 1966); *Goodwin v. United States,* 458 F. 2d 108 (Ct. Cl. 1972); and, *Quick v. United States,* 503 F. 2d 100 (10th Cir. 1974).

In *Meissner,* the executors used the alternative tax to offset the section 691(c) deduction against the related income in respect of a decedent (capital gain) and the respondent argued that the 691(c) deduction could be applied only against ordinary income. The Court of Claims refused to so hold and stated at page 413:

We are of the view, however, that taxpayers are not limited to an "either-or" choice; we think that to carry out the purpose of section 691(c), a taxpayer should be able to use the deduction in the way most advantageous to him. Stated differently, he should be able to use it against ordinary income first and any balance against capital gain. * * *

In *Goodwin,* where the income in respect of a decedent was again capital in nature, the Government reversed its position and

contended that when the income in respect of a decedent was capital gain, the 691(c) deduction could be taken only as a deduction from gross income which includes the capital gain income in respect of a decedent item (since the alternative tax was not used) and could not be deducted from unrelated ordinary income. The Court of Claims again held for the taxpayer, following the *Meissner* decision.

The taxpayer did not use the alternative tax in *Quick* and the Court of Appeals for the Tenth Circuit held that when the section 691(c) deduction is greater than the long-term capital gain income in respect of a decedent remaining after the 1202 deduction is taken the deduction need not be restricted to the item which gave rise to it, and could be taken against income unrelated to that deduction. The facts there were that the taxpayer received installment payments consisting of long-term capital gains which constituted income in respect of a decedent. The taxpayer deducted the estate tax allowance after the section 1202 capital gains deduction had been taken. The Government, upon audit, rearranged the figures by deducting the estate tax allowance from the entire capital gain, then applying the 50-percent capital gains deduction. The court in *Quick* noted that, although the statute reads that the estate tax deduction "shall be allowed," it does not specifically state from what it should be deducted, nor does it state the point in time at which it should be taken. The Court of Appeals for the Tenth Circuit, following *Meissner,* held that since no method was specified, the deduction could be taken in the manner "most advantageous to the taxpayer."

The issue before us is precisely the one considered in *Goodwin* and *Quick,* although those cases involved section 1202. See and compare *J. T. Bridges, Jr.,* 64 T.C. 968 (1975). We are convinced that the rationale of those cases is correct. We think the purpose of section 691(c) is only:

to provide approximately the same tax consequences in the case of a decedent whose gross estate includes claims to income as in the case of a decedent all of whose income receivables had been collected (and income tax paid thereon) prior to his death. * * * [2 Mertens, Law of Federal Income Taxation, sec. 12.102(b), ch. 12, p. 404.]

* * *

To adopt the Government's view would result in the imposition of both estate and income tax on the income amounts where the alternative computation was used. * * * [*Read v. United States,* 320 F. 2d 550, 553 (5th Cir. 1963).]

Section 691(c)(1)(A) provides:

(A) GENERAL RULE.—A person who includes an amount in gross income under subsection (a) shall be allowed, for the same taxable year, *as a deduction* an amount which bears the same ratio to the estate tax attributable to the net value for estate tax purposes of all the items .described in subsection (a)(1) as the value for estate tax purposes of the items of gross income or portions thereof in respect of which such person included the amount in gross income (or the amount included in gross income, whichever is lower) bears to the value for estate tax purposes of all the items described in subsection (a)(1). [Emphasis added.]

We have examined the legislative history of section 691 and have found nothing to indicate that the deduction provided in section 691(c) can only be used to offset section 691(a) income items. The express language of the statute does not indicate that the deduction should be so limited, and we are reluctant to imply such an intent on the part of Congress based on speculation.

Our holding results in as close an approximation as is possible without adding additional language to section 691(c). We agree with the Court of Claims that "taxpayers are not limited to an 'either-or' choice." *Goodwin v. United States, supra* at 111.

Accordingly, we conclude that the estate tax deduction provided by section 691(c) may be used first against ordinary income and then against long-term capital gain income in respect of a decedent.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

HALL, *J.,* concurring in the result: I believe the liquidation gains did constitute income in respect of a decedent. However, some of the language in the Court's opinion could be construed as going farther than I would in stating the criteria for distinguishing income in respect of a decedent from mere unrealized appreciation in value of property. The issue, as properly framed by the Court's opinion, is whether at death decedent had a *right* to receive the Bi-State liquidation proceeds. Under Nebraska law, the filing of a statement of intent to dissolve without more obligates the corporation to cease doing business and distribute its assets to its shareholders. Nebraska Business Corporation Act, Neb. Rev. Stat. secs. 21-2085 and 21-2086 (1974). Should the

corporate directors fail to make such a distribution, within a reasonable period the shareholders would apparently be able to sustain an action to compel such a distribution in the absence of shareholder action reversing the original dissolution resolution. At that point the shareholders are vested with a legal right to the proceeds, and the postdeath gains are income in respect of a decedent. The case is analogous to the execution of an enforceable executory contract of sale. *Trust Co. of Georgia v. Ross,* 392 F. 2d 694 (5th Cir. 1967), cert. denied 393 U.S. 830 (1968). However, I do not consider it significant that decedent, as Bi-State's sole shareholder, had the *power* to compel payment of the liquidating distribution when he died, for any sole shareholder, as a practical matter, has such power at all times. Reference to the sole shareholder's *power* proves too much. He has the effective power, for example, to cause an ordinary dividend to be declared. But when no formal directors' action declaring such a dividend has been taken, a postdeath declaration would not give rise to income in respect of a decedent, for the decedent had no *right* at death to such a distribution. What counts is whether the formal corporate actions have been taken which would give even a *minority* shareholder the legal right to compel a liquidating distribution. References to cases holding that a "right" need not be a "legal" right are also inapposite here in the context of realization of gains on appreciated property. Such cases involve compensation income. Indeed, it may well be that even in the compensation cases a *right* existed to compensation in quantum meruit, as evidenced by the very postdeath, nondonative payment which was held to be income in respect of a decedent. In any event, short of the existence of a fixed, predeath *legal* right to the proceeds of a sale or exchange, I would not consider realization of gains on the sale or exchange of property to be income in respect of a decedent.

WILBUR, *J.,* agrees with this concurring opinion.

TANNENWALD, *J.,* dissenting in part: While the issue is not entirely free from doubt, I accept the majority conclusion that the proceeds of the liquidation are "income in respect of a decedent" within the meaning of section 691. Prior to the decedent's death, both the directors and the shareholders had not only resolved to liquidate Bi-State but had specifically provided

in the respective resolutions that all of Bi-State's assets be sold, that the officers of Bi-State be "authorized *and directed* to file a Statement of Intent to Dissolve and Articles of Dissolution pursuant to the Nebraska Business Corporation Act" (emphasis supplied), and that the debts of Bi-State be paid and "the remaining assets * * * be distributed * * * as soon as practicable but in no event later than the termination of a twelve-month period." Additionally, also prior to decedent's death, the statement of intent to dissolve had been filed with the secretary of state of Nebraska. Finally, at the times the resolutions were adopted and the statement of intent to dissolve filed and at the time of his death, decedent was the sole shareholder of Bi-State. To be sure, under section 21-2088, Nebraska Business Corporation Act, Bi-State's board of directors could have revoked the dissolution proceeding after decedent's death and prior to the filing of the certificate of dissolution. But, in my opinion, this possibility is not enough to obviate the conclusion that, under the circumstances herein, decedent's right to receive the liquidation proceeds had so matured as to make him "entitled" to such proceeds and thus bring the transaction within section 691. See sec. 1.691(a)-1(b), Income Tax Regs.

The fact that the right to proceeds of liquidation may not have sufficiently ripened to require them to be included in decedent's income on the theory of constructive receipt (decedent being a cash basis taxpayer)[1] or as accrued income (had decedent been an accrual basis taxpayer) is beside the point. The legislative history of the predecessor of section 691 (sec. 126, I.R.C. 1939) shows clearly that the applicable standard for taxing income in respect of a decedent was intended to be broader and to cover "All amounts of gross income *which are not includible in the income of the decedent.*" (Emphasis added.) See H. Rept. No. 2333, 77th Cong., 2d Sess. 84 (1942); S. Rept. No. 1631, 77th Cong., 2d Sess. 101 (1942). See also *Commissioner v. Linde,* 213 F. 2d 1, 6 (9th Cir. 1954).

In the foregoing context, I believe *Keck v. Commissioner,* 415 F. 2d 531 (6th Cir. 1969), revg. 49 T.C. 313 (1968), and *W. B. Rushing,* 52 T.C. 888 (1969), affd. 441 F. 2d 593 (5th Cir. 1971), are distinguishable. In those cases, the decedent (*Keck*) and the transferor (*Rushing*) did not have such control and the right to

---

[1] Compare *W. B. Rushing,* 52 T.C. 888, 896-897 (1969), affd. 441 F. 2d 593 (5th Cir. 1971).

890

receive the amounts in question could have been varied or even destroyed by the action of independent third parties.[2] The circumstances herein are more closely akin to those involved in *Hudspeth v. United States,* 471 F. 2d 275 (8th Cir. 1972), and I would apply the rationale of that case. In so stating, I recognize that there may be a distinction, due to the involuntary nature of death, between a situation involving the applicability of section 691 and one involving a claimed assignment of income (*Hudspeth*) but, in the instant situation, I think it is a distinction without a difference.

My disagreement with the majority goes to the issue of how the estate tax deduction under section 691(c) should be applied. The majority rests its decision in favor of the petitioners on the ground that, since section 691(c) does not indicate that the estate tax deduction can only be used to offset section 691(a) income items, a taxpayer should have a choice and be able to use the deduction in the way most advantageous to him, i.e., by applying it first to ordinary income and using the balance of the deduction against long-term capital gain. In thus giving effect to section 691(c), the majority ignores the plain mandate of section 1201(b).[3]

In *Read v. United States,* 320 F. 2d 550 (5th Cir. 1963), the alternative tax applied [4] and the taxpayer sought to offset the entire estate tax deduction against the long-term capital gain. The Court of Appeals rejected the Government's contention that the estate tax deduction could be taken only against ordinary

---

[2] It is not without significance that in *George W. Keck,* 49 T.C. 313 (1968), revd. 415 F. 2d 531 (6th Cir. 1969), the dissenting judges in this Court specifically reserved the question whether they would hold to the same view if the decedent had been the controlling shareholder, which is the case herein. See 49 T.C. at 323 n. 1.

[3] During the taxable years in question, that section read as follows:

SEC. 1201(b). OTHER TAXPAYERS.—If for any taxable year the net long-term capital gain of any taxpayer (other than a corporation) exceeds the net short-term capital loss, then, in lieu of the tax imposed by sections 1 and 511, there is hereby imposed a tax (if such tax is less than the tax imposed by such sections) which shall consist of the sum of—

(1) a partial tax computed on the taxable income reduced by an amount equal to 50 percent of such excess, at the rate and in the manner as if this subsection had not been enacted, and

(2) an amount equal to 25 percent of the excess of the net long-term capital gain over the net short-term capital loss.

[4] Some confusion exists in the cases regarding the mandatory or elective nature of the alternative tax, but this is primarily due to the fact that where the alternative tax produces a result more favorable to the taxpayer, he will always use it. However, the alternative tax is required to be applied if it produces a lower tax. See *Lone Manor Farms, Inc.,* 61 T.C. 436, 442 (1974), affd. without published opinion 510 F. 2d 970 (3d Cir. 1975). But see *J. T. Bridges, Jr.,* 64 T.C. 968 (1975).

income.[5] In effect, the Court of Appeals held that, in applying the alternative tax, section 691(c) was self-contained, i.e., the estate tax deduction should be offset against the long-term capital gain, and disagreed with the contention that the estate tax deduction was to be treated like any other deduction, with the result that it could not be used in the alternative tax computation.

In *Meissner v. United States,* 364 F. 2d 409 (Ct. Cl. 1966), it appears that the taxpayer sought, as had the taxpayer in *Read,* to offset the estate tax deduction against its long-term capital gain in determining the amount of tax due under the alternative tax computation. The Government again asserted the position it had taken in *Read,* and the Court of Claims, following the Court of Appeals in that case, held for the taxpayer. However, because sizable amounts of ordinary income were involved and because the amount of the refund would have to be determined in subsequent proceedings (see 364 F. 2d at 410 n. 2, and 412), the Court of Claims went on to express its views on the issues involved in the instant case. Describing what it was doing as a possible "refinement to *Read*" (see 364 F. 2d at 414), the Court of Claims reasoned that, in computing the alternative tax, the estate tax deduction was to be allowed first against ordinary income and, to the extent not so used, against the long-term capital gain.

In *Goodwin v. United States,* 458 F. 2d 108 (Ct. Cl. 1972), it is unclear whether only the regular income tax was involved or both the regular income tax and the alternative tax as in *Meissner.* The main issue was whether the estate tax deduction came "off the bottom," i.e., after the application of the 50-percent long-term capital gain deduction under section 1202, as contended by the taxpayer, rather than "off the top," i.e., before the application of such capital gain deduction, as contended by the Government. See *Quick v. United States,* 360 F. Supp. 568, 570 (D. Colo. 1973), affd. 503 F. 2d 100 (10th Cir. 1974). The Court of Claims applied the rationale of *Meissner* and sustained the taxpayer.

In *Quick v. United States,* 503 F. 2d 100 (10th Cir. 1974), the Tenth Circuit Court of Appeals followed *Goodwin* in a situation where the alternative tax was not involved and rejected the Government's contention on the ground that it would result in

---

[5] The taxpayer had not sought to apply any part of the estate tax deduction against ordinary income.

depriving the taxpayer of the full benefit of the section 691(c) deduction by, in effect, cutting it in half. This Court recently applied *Quick* in *J. T. Bridges, Jr.,* 64 T.C. 968 (1975), where the alternative tax was likewise not involved.

Unquestionably, *Meissner* and possibly *Goodwin,* as well as the rationale of *Quick* and *Bridges,* depart from the concept of *Read* that section 691 is self-contained, with the result that the estate tax deduction should be treated as an offset against the item of income in respect of a decedent, in the sense that they treat the estate tax deduction like any other deduction, although *Meissner* and the reasoning of *Goodwin* also return to the offset technique by permitting the amount of the estate tax deduction not used against ordinary income to be offset against the long-term capital gain in computing the alternative tax. With all due respect, I think that this departure from *Read* is erroneous and that the majority herein is wrong in following the same path.

My own view is that *Read* reflects the correct approach, i.e., that section 691 should be treated as self-contained, with the estate tax deduction offsetting the long-term capital gain. Compare *Statler Trust v. Commissioner,* 361 F. 2d 128 (2d Cir. 1966), revg. 43 T.C. 208 (1964), and *United States v. Memorial Corp.,* 244 F. 2d 641 (6th Cir. 1957). This approach comports with the objective of allowing "an offsetting deduction" enunciated in the legislative history of section 691(c). See H. Rept. No. 1337, 83d Cong., 2d Sess. 64 (1954); S. Rept. No. 1622, 83d Cong., 2d Sess. 87 (1954). See also *Read v. United States,* 320 F. 2d at 553; *Quick v. United States, supra.* The net amount thus obtained is then carried out of section 691, included in income, and becomes subject to other allowable deductions.

Another possible approach is that reflected in *Quick v. United States, supra,* and *J. T. Bridges, Jr., supra,* where the taxpayer was allowed to move the estate tax deduction out of section 691 in order not to impair his right to its full benefit through the application of section 1202. But, as I see it, there is no basis for applying a different concept in synthesizing sections 691(c) and 1202 rather than sections 691(c) and 1201(b). In both situations, the basic question is what is the proper amount of the long-term capital gain which should be treated as income in respect of a decedent.[6]

---

[6] It should be noted that the alternative tax was not involved in either *Quick* or *Bridges,* so, despite this conceptual conflict, they are factually·distinguishable from the instant case.

In any event, I do not believe petitioners should be able to utilize the estate tax deduction in part to reduce their taxable income to zero under step 1 of the alternative tax computation (sec. 1201(b)(1)) and then use the balance of the estate tax deduction against their long-term capital gain under step 2 of that computation (sec. 1201(b)(2)). To allow petitioners to go this far violates the mandate of section 1201(b), which clearly eliminates any deductions (see *Walter M. Weil*, 23 T.C. 424 (1954), affd. 229 F. 2d 593 (6th Cir. 1956); *Pope & Talbot, Inc.*, 60 T.C. 74 (1973), affd. per curiam 515 F. 2d 155 (9th Cir. 1975)), and enables them to have their cake and eat it too. With respect to the objective of achieving the same tax consequences to the estate or beneficiary which would have obtained if the decedent collected the income item prior to death (see, e.g., *Read v. United States*, 320 F. 2d at 553), there are so many permutations and combinations involved, due to variations in the composition of decedent's income, deductions, and applicable tax brackets, as against those of the estate or a beneficiary, and in estate tax brackets, depending upon whether the decedent pays, or is obligated to pay, the applicable income tax prior to, or at the time of, his death, and the amount of that income, as to make impossible an all-inclusive illustrative calculation. But, the hard fact is that, under the majority approach, the estate or beneficiary gets an excessive benefit, since the alternative tax of 25 percent of long-term capital gain, by hypothesis, requires a higher rate of ordinary income tax. Thus, in every case where the alternative tax computation applies and the ordinary income tax rate exceeds 25 percent, which occurs at relatively low levels, to wit, $10,000 of taxable income in the case of estates and $16,000 in the case of married individuals filing joint returns, every dollar of the estate tax deduction attributable to a long-term capital gain item under section 691(c), allowed against ordinary income rather than as an offset in computing long-term capital gain, produces a greater tax benefit. To my mind, such a consequence is repugnant to section 1201(b) and is not required to satisfy the provisions of section 691(c).

I would sustain respondent's computation in the instant case.

RAUM, *J.*, agrees with this dissent.

FEATHERSTON, *J.,* dissenting: I respectfully disagree with the majority's conclusion on the first issue. Section 691(a), which prescribes the general rule for the taxation of "income in respect of a decedent," refers to the "right to receive" items of gross income. Generally speaking, the term "income in respect of a decedent" applies only to "those amounts to which a decedent was entitled as gross income" but which were not properly includable in his final return. Sec. 1.691(a)-1(b), Income Tax Regs. As stated in *Trust Co. of Georgia v. Ross,* 392 F.2d 694, 695 (5th Cir. 1967), cert. denied 393 U.S. 830 (1968): "the right [to income] is to be distinguished from the activity which creates the right. Absent such a right, no matter how great the activitives or efforts, there would be no taxable income under sec. 691." While the right to income need not be a legal right to *collect* a sum ascertainable on the date of death, see *Commissioner v. Linde,* 213 F.2d 1 (9th Cir. 1954), remanding 17 T.C. 584 (1951), cert. denied 348 U.S. 871 (1954); *O'Daniel's Estate v. Commissioner,* 173 F.2d 966 (2d Cir. 1949), affg. 10 T.C. 631 (1948), the right to collect the income *when realized* must have arisen prior to or at the decedent's death. The problem in the instant case, therefore, is not to weigh and assess the probabilities at decedent's death that his estate or some other beneficiary would or would not ultimately receive the proceeds of the liquidation of Bi-State, but rather to determine the *rights* of the decedent or that beneficiary as of the date of decedent's death.

This imprecise test is not easily applied to cases involving the liquidation of corporations. In my opinion, in such cases "The crucial question should be whether the redemption or liquidation has proceeded to a point beyond the control of the decedent prior to his death." Ferguson, Freeland & Stevens, Federal Income Taxation of Estates and Beneficiaries 208 (1970). The issue of whether a contract for the disposition of property has created income in respect of a decedent, e.g., via sale, is analogous. In contract cases, the issue is whether, on the date of death, the transaction has proceeded to the point where the value of the property has been converted into an intangible right to receive the ultimate proceeds of the sale or other disposition. Sec. 1.691(a)-2(b), *Example 4,* Income Tax Regs. Such a conversion occurs only when the property is somehow put beyond the control of decedent prior to his death. See *Commissioner v. Linde, supra; Estate of Helen Davison,* 155 Ct. Cl. 290, 292 F.2d 937 (1961),

cert. denied 368 U.S. 939 (1961); *Stephen H. Dorsey,* 49 T.C. 606, 633 (1968). In *Trust Co. of Georgia v. Ross, supra,* for example, the court, holding that the disposition of certain stock by decedent prior to his death created income in respect of a decedent, stated (392 F.2d at 696):

[Decedent] entered into a binding contract prior to his death. That contract required the conveyance of the property from whence the income in litigation was derived. The contract created a right to these proceeds in [decedent] at the time the contract was executed. The contract inured to and was binding upon his executor.* * *

In contrast, in *Keck v. Commissioner,* 415 F.2d 531 (6th Cir. 1969), revg. 49 T.C. 313 (1968), discussed at length in the majority opinion, where a contingent or informal agreement to liquidate a corporation did not constitute a binding contract, the Court of Appeals refused to find income in respect of a decedent.

I do not think the liquidation of Bi-State, at decedent's death, had proceeded to a point beyond his control so that his stock had been converted to a mere right to receive income. It bears reiterating that decedent was *sole* shareholder of Bi-State. To the extent possible under a scheme of State regulation his control of that corporation was absolute, and his rights were in no way diluted by the presence of minority shareholders. His estate succeeded to the same quantum of control.

At any time prior to his death, decedent, the sole shareholder, could have reversed the decision to liquidate Bi-State. Neb. Rev. Stat. secs. 21-2087, 21-2088 (1974). Similarly, at any time after his death and prior to the distributions on November 29 and 30, 1968, decedent's estate, as sole shareholder, could have rescinded the resolution to liquidate and sold the stock to a third party or could have decided to keep the corporation alive so that, for example, it could continue the operation of the gift shop or the ownership of the real and personal property located at 4827 Dodge Street in Omaha. Had the estate taken either one of those steps, clearly it would not have received income in respect of a decedent. The estate received the liquidation proceeds only because it, as sole shareholder, did not revoke the liquidation resolution.

Under the *Trust Co. of Georgia* reasoning, since there was no commitment by either the decedent or his executor to permit Bi-State to be liquidated, decedent's stock at his death had not been converted to income.

The importance of the power to rescind a decision to liquidate a corporation has been emphasized in cases dealing with the transfer of stock in a corporation after the adoption of a resolution to liquidate. In *Rushing v. Commissioner,* 441 F.2d 593 (5th Cir. 1971), affg. 52 T.C. 888 (1969), the court held that the transfer of a controlling interest in the corporation relieved the transferor of tax on the liquidation proceeds of the transferred shares. An opposite result was reached in *Hudspeth v. United States,* 471 F.2d 275 (8th Cir. 1972), where the taxpayer transferred shares to a charity but retained a controlling interest in the corporation. The *Hudspeth* court explained the dichotomy as follows (471 F.2d at 278):

we read *Rushing* [*Rushing v. Commissioner,* 441 F.2d 593 (5th Cir. 1971)] as evincing the proposition that if the donor or vendor transfers a *controlling interest* in a corporation, such that the transferee will have the legal capacity to suspend or rescind the liquidation and thereby have the power to supercede the donor's initial intent to provide the donee only with the otherwise imminent liquidation proceeds, then the gains are not taxable to the transferor. But, in the case where the taxpayer retains control of the corporation and the transferee will be unable to vitiate the taxpayer's intent to liquidate, the shareholders' vote remains sufficient to constitute the necessary severance of gain.

To the same effect, see *Kinsey v. Commissioner,* 477 F.2d 1058, 1062 (2d Cir. 1973), affg. 58 T.C. 259 (1972); *Simmons v. United States,* 341 F. Supp. 947, 951 (M.D. Ga. 1972); cf. *Jacobs v. United States,* 280 F. Supp. 437 (S.D. Ohio 1966), affd. 390 F.2d 877 (6th Cir. 1968). While these cases involved the alleged constructive receipt or anticipatory assignment of income, I think their reasoning is apposite in resolving the present controversy. The right of the decedent or his estate to rescind the liquidation resolution shows that the liquidation had not proceeded to a point beyond the control of the decedent-shareholder. His unbridled right unilaterally to reverse the liquidation decision eviscerated any claim to a "right" to the liquidation proceeds under the Nebraska statute.

Deciding the first issue in this fashion would obviate the necessity for dealing with the second one.

FORRESTER and DRENNEN, *JJ.,* agree with this dissent.