**COMMISSIONER OF INTERNAL REVENUE**

v.

**LINDE.**

No. 13417.

United States Court of Appeals Ninth Circuit.

May 4, 1954.

Rehearing Denied June 7, 1954.

H. Brian Holland, Asst. Atty. Gen., George F. Lynch, Ellis N. Slack, A. F. Prescott, L. W. Post, Sp. Assts. to Atty. Gen., Washington, D. C., Charles W. Davis, Chief Counsel, Bureau of Internal Revenue, Washington, D. C., for petitioner.

Samuel Taylor, Walter G. Schwartz, San Francisco, Cal., for respondents.

Before DENMAN, STEPHENS and POPE, Circuit Judges.

POPE, Circuit Judge.

The respondent was the widow of Herman C. Lange who died December 10, 1943. The decedent was a farmer and owned and operated vineyards near Lodi, San Joaquin County, California. He marketed his wine grapes by delivering them to cooperative marketing associations of which he and other grape growers were members. The marketing associations processed their members' grapes into wine and other grape products and marketed the products on behalf of the members. The members of these associations delivered agreed quantities of grapes to the wineries of the associations where they were commingled with those of other members and each year they became a part of what was termed a wine pool for that year. Each member was assigned a percentage of interest in the pool. Ultimately the net proceeds from the sales of the products were returned to the members of the pools in proportion to their percentage of interest therein, all in accordance with the provisions of written agreements made between the association and the individual members.[1]

Respondent was the sole legatee under the will of Lange. The estate was closed in 1944. In that year decedent's share of certain liquidation proceeds of the associations' pools were paid to the estate and in 1945 decedent's share of additional liquidation proceeds then payable were paid to the respondent taxpayer.

The principal question presented by the petition now before us is the contention that these payments received by respondent in 1945 in the amount of $38,484.12 constituted items of gross income in respect of a decedent taxable under section 126 of the Internal Revenue Code.[2] The Commissioner's determina-

---

1. The facts relating to these agreements and the arrangements between the decedent and these associations are set forth at length in the opinion of the Tax Court, 17 T.C. 584, at pages 586 to 589.

2. Sec. 126(a) (1) provides as follows: "Income in respect of decedents. (a) Inclusion in gross income. (1) General rule. The amount of all items of gross income in respect of a decedent which are not properly includible in respect of the taxable period in which falls the date of his death or a prior period shall be included in the gross income, for the taxable year when received of: (A) the estate of the decedent, if the right to receive the amount is acquired by the decedent's estate from the decedent; (B) the person who, by reason of the death of the decedent, acquires the right to receive the amount, if the right to receive the amount is not acquired by the decedent's estate from the decedent; or (C) the person who acquires from the decedent the right to receive the amount by bequest, devise, or inheritance, if the

tion to that effect was rejected by the Tax Court, Rose J. Linde, 17 T.C. 584. After examining the provisions of the marketing agreements between the decedent and the cooperative associations, that court concluded that notwithstanding the fact that these agreements referred to the members "selling" and the Associations "purchasing" the wine grapes, and notwithstanding other provisions indicating that the associations took title to the grapes and exercised rights of ownership over them, yet the parties never intended a sale of grapes to the associations to take place; that the relationship between the decedent and the associations which arose out of these agreements and the delivery of the grapes from which the proceeds here in question arose, was one of trust; and that the association was a trustee or agent in respect to the grapes and the resultant proceeds and not a buyer pursuant to a sale.

In reaching this conclusion the Tax Court relied upon certain decisions dealing with the relationship between the members and such associations under California law.[3] The Tax Court pointed out that the payments received by the respondent in 1945 were the net proceeds of sales of products made by the associations in that year or in the latter part of 1944 after the date of decedent's death. It held: "Since such sales were not made during decedent's lifetime there could be no distributable proceeds due him when he died. Accordingly, no right to income from this source arose during the decedent's lifetime."

■ While the Commissioner does undertake to argue that under the marketing agreements here involved there was a sale of grapes to the associations, we find it unnecessary at this stage to reach that question; for it is our judgment that even assuming that sales

were not made by decedent during his lifetime, yet the amounts paid to the respondent taxpayer in 1945 pursuant to and in accordance with the agreements with the associations constitute "income in respect of a decedent" within the meaning of section 126. We cannot agree with the Tax Court's conclusion that if such sales did not take place during the decedent's lifetime, section 126 has no application to the proceeds thus received by the taxpayer.

The decision of the Tax Court cannot be squared with that in O'Daniel's Estate v. Commissioner, 2 Cir., 173 F.2d 966, 968. The decedent in that case had been an officer of a corporation which had a bonus plan in which the decedent had participated for a number of years. Decedent had no enforceable right under that plan to an allotment of a bonus for any year until the share was designated by the proper officer. Decedent died in 1943 and no share of the bonus for 1943 was designated until 1944, several months after his death, when the share was paid to his estate. It was held that such sum was gross income in respect of the decedent within the meaning of section 126(a)(1)(A). This was held notwithstanding decedent during his lifetime had no enforceable right to receive that amount. But attention was called to the fact that the payment represented compensation for services and that if decedent had lived to receive such amount it would have been includible in his gross income and reportable and taxable in that year as income for services. The court said: "The bonus was derived through rights he had acquired, which even if not fixed at the time of his death were then expectancies which later bore fruit." In our view the statement just quoted is equally applicable to the proceeds of the wine pools received by the respondent taxpayer in the year 1945.

amount is received after a distribution by the decedent's estate of such right." 26 U.S.C.A. § 126(a) (1).

3. Olson v. Biola Co-op. Raisin Growers Ass'n, 33 Cal.2d 664, 204 P.2d 10, 12 A.L.R.2d 112; Bogardus v. Santa Ana Walnut Growers Ass'n, 41 Cal.App.2d 939, 108 P.2d 52; California & Hawaiian Sugar Refining Corp. Ltd. v. Commissioner, 9 Cir., 163 F.2d 531; San Joaquin Valley Poultry Producers' Ass'n v. Commissioner, 9 Cir., 136 F.2d 382.

Cf. also Bausch's Estate v. Commissioner, 2 Cir., 186 F.2d 313.

We think that the text of section 126 as well as the history of the legislation relating to the income of a decedent demonstrate the soundness of the O'Daniel decision and that the principles there expressed must be applied in the instant case. If the decedent had lived until the day when these crop pool proceeds were paid to him the payments so received would have been ordinary income. Sec. 126 itself contains strong evidence of congressional intent to see to it that the tax upon income which would have been derived had the decedent lived should not be lost to the treasury in consequence of his death. Thus subparagraph (3) of section 126(a) provides that "the amount includible in gross income under paragraph (1) * * * shall be considered in the hands of the estate or such person to have the character which it would have had in the hands of the decedent if the decedent had lived and received such amount." The payments which the taxpayer received in 1945 were realized under and in consequence of contracts and deals made by the decedent in his lifetime. No act or thing taken or performed by the taxpayer operated to procure or to give rise to this payment. Such payments had their source exclusively in the decedent's contract and arrangement with the cooperative associations. And since in his hands had he lived and received these amounts they would have had the character of ordinary income, the quoted provision of subdivision (3) would make it

appear that they have the same character, that is, ordinary income, in the hands of this taxpayer who acquired the right to receive that amount by bequest from the decedent within the meaning of subdivision (C) of subparagraph (1) of section 126(a). See footnote 1, supra.

The situation which led to a series of efforts on the part of Congress to avoid the loss of income taxes which would have been received were it not for the death of a decedent, is stated in Helvering v. Enright, 312 U.S. 636, 639, 61 S.Ct. 777, 85 L.Ed. 1093. There the court was dealing with the effect of section 42 of the Revenue Act of 1934, 26 U.S.C.A. § 42. This is the section that provided that in the case of the death of a taxpayer there be included in computing net income for the taxable year in which his death fell amounts accrued up to the date of his death even although such amounts were not yet received and without regard to whether the decedent had reported income on a cash receipts and disbursements basis or otherwise.[4]

The court explained the reason for this 1934 enactment as follows, 312 U.S. at page 639, 61 S.Ct. at page 779: "The last sentence of § 42 which requires the inclusion of 'amounts accrued up to the date of his death' in computing net income for the period in which his death falls was added by the 1934 Revenue Act. The reports recommended its addition because the 'courts have held that income accrued by a decedent on the cash basis prior to his death is not income to the estate, and under the present law, unless such income is taxable to the decedent,

---

4. There a lawyer on the cash basis was a member of a partnership whose partnership agreement provided that upon his death his estate would be entitled not only to his percentage in outstanding accounts, but also to a proportion of the estimated receipts from unfinished business. Upon his death the right in the uncollected accounts and to the accrued interest in the unfinished work were valued by agreement and the sums thus arrived at reported in the assets of estate and inheritance tax returns, but were not included

in the income tax returns made for the decedent in the year of his death nor in the estate's income for that year or later years. It was held that the Commissioner accurately assessed these sums as a deficiency by including them in the decedent's return for the year of his death and that this amount was properly "accrued" within the meaning of Sec. 42, notwithstanding such sums would not have been accrued within the ordinary meaning of that term.

it escapes income tax altogether.' "[5] The court undertook to effectuate this legislative objective of seeing to it that income which would have been taxable had the decedent lived to receive it should not escape income tax simply by reason of the decedent's death. It sustained the Commissioner's assessment of a deficiency which included an item of $40,855.77, representing the value of the interest of the deceased partner in the work of the partnership which was unfinished at the time of his death. In order to do so the court gave the word "accrued" a meaning beyond that generally used in referring to a taxpayer on the accrual basis. It said: "Accruals here are to be construed in furtherance of the intent of Congress to cover into income the assets of decedents, earned during their life and unreported as income, which on a cash return, would appear in the estate returns. Congress sought a fair reflection of income. * * * The completion of the work in progress was necessary to fix the amount due but the right to payment for work ordinarily arises on partial performance. Accrued income under § 42 for uncompleted operations includes the value of the services rendered by the decedent, capable of approximate valuation whether based on the agreed compensation or on quantum meruit." 312 U.S. at page 644, 61 S.Ct. at page 782. It is noteworthy that the rule applied in the Enright case would serve to bring about an additional tax in the case of the estate of a similarly situated decedent who had been reporting upon the accrual basis.

In 1942 the new Sec. 126 was enacted. One reason for its enactment was that the device which Congress adopted in 1934 as exemplified in the Enright case resulted in a "bunching" of income which, had the decedent lived, would have extended over several years into the year of his death, and this was thought to result unfairly in the application of larger surtax rates. But while Sec. 126 was designed to relieve this bunching, there is nothing in the legislative history or in the text of Sec. 126 to indicate that it was intended to be anything other than an improved device to accomplish the general purpose of the internal revenue code that all income should pay a tax and that death should not rob the United States of the revenue which otherwise it would have had.[6] We think it clear that the intent of Congress continued to be as stated in the Enright case "to cover into income the assets of decedents, earned during their life and unreported as income". As stated in the Committee reports, "The right to income is treated in the hands of the decedent differently from his other property, and when his estate or his legatee takes his place with respect to this income, it is proper to continue to treat this right in their hands in the same manner as it would be treated in the hands of the decedent." S.Rep. 1631, 77th Cong. 2d Sess.Cum. Bull.1942–2, p. 580.[7]

Had the decedent lived to receive these sums in 1945 they would have been reportable and taxable in that year as income. Any right to receive those sums that was realized by the respondent taxpayer was acquired through Lange and

---

5. The court at this point added a footnote stating:
   "This situation followed the decision of the Court of Claims in Nichols v. United States, 64 Ct.Cl. 241. A decedent on the cash basis was a member of a partnership dissolved by his death. Commissions earned before death but unpaid to the partnership were valued in the estate tax and collected by the partnership after death for payment to the executors. The Court of Claims held sums paid the executors were part of the corpus and not income."

6. Of course the estate tax is no substitute for such an income tax loss. Sec. 126(c) provides that the recipient of income in respect of a decedent may deduct that portion of the estate tax levied on the decedent's estate which is attributable to the inclusion of the right to such income in the decedent's estate.

7. An extensive quotation from this report appears as footnote (1) on page 968, of 173 F.2d of the O'Daniel case.

never arose in any other way or through any other source.[8]

It has been suggested that the rule of Estate of Tom L. Burnett, 2 T.C. 897, supports the Tax Court's decision here. That case related to a contested adjustment for the year 1938, before section 126 was adopted. The court refused to extend the result reached in the Enright case to the fair market value on the date of the decedent's death of live stock and feed stuffs which had been raised by decedent up to the date of his death. The court said: "We have here simply the ownership of certain livestock and farm products which had been produced by the decedent on his ranches during his lifetime. This property had not been sold or exchanged by decedent at the time of his death. It was simply owned. No one was indebted to him for its fair market value or any part thereof. We do not think that the mere ownership of this property by decedent at the time of his death, even though it had been produced on his ranches during his lifetime, caused it to be gross income accrued to him up to the date of his death within the meaning of the language used in section 42 of the Revenue Act of 1938." The petition to review that decision was dismissed before hearing, and the Commissioner acquiesced in it.[9]

It is suggested that here the decedent's wine at the wineries was in no different situation than Burnett's feed stuffs in his barn. And the suggestion proceeds that the only purpose of section 126 was to relieve from the "bunching" effect of the 1934 Act, that it had no other objective, and hence that which would not be "amounts accrued up to the date of his death" under the 1934 Act, would not be "income in respect of a decedent" under section 126.

As we have previously indicated, it is our view that section 126 was but an improved method adopted by Congress in aid of its continuing effort to avoid the loss of tax upon income merely because of the death of the decedent who would have paid a tax upon the same economic returns had he lived to receive them.

The Internal Revenue Code as a whole manifests a general intent on the part of Congress to reach and tax all that rightly comes within the concept of income. Thus section 22(a) defines gross income in very broad terms, sweeping up into the general provision "gains or profits and income derived from any source whatever." The broad language there was an effective means to indicate the purpose to include all items that are constitutionally income.[10] The similarly broad and inclusive reference in section 126 to "all items of gross income in respect of a decedent which are not properly includible in respect of the taxable period in which falls the date of his death or a prior period" is, we think, the result of a conscious effort to catch and tax all items of the character here involved.[11]

---

8. Such is the language used in the O'Daniel case in speaking of the bonus there received by decedent's estate: "It is true that the decedent would not have had a legally enforceable right to receive the foregoing amount until it was allocated by the American Cyanamid Company, but the payment clearly represented compensation for his services and any right to receive it that was realized by his estate was acquired through him and never arose in any other way or through any other source." 173 F.2d 966, 967.

9. In concluding its opinion the Tax Court noted that section 126 had then been adopted, and noting that it had no retroactive application to that case because of failure of the parties to file the requisite consents for that purpose, the court expressly confined its decision to the earlier provisions, without reference to section 126.

10. United States v. Robertson, 10 Cir., 190 F.2d 680, 682, affirmed 343 U.S. 711, 72 S.Ct. 994, 96 L.Ed. 1237, and cases there cited. Cf. Roberts v. Commissioner, 9 Cir., 176 F.2d 221, 225, 10 A.L.R.2d 186.

11. The similar purpose of the 1934 enactment of section 42 was alluded to in Helvering v. McGlue's Estate, 4 Cir., 119 F.2d 167.

We are not called upon here to express any opinion upon the Tom L. Burnett decision. The Commissioner's acquiescence therein in no manner qualifies his right to insist that the amount here in controversy is subject to tax under section 126. In the Burnett case there was a question whether there had been a realization of income at the date of death. The improved mechanics of section 126 avoids any such problem, and any inconvenience and inequity arising from attaching a value to such farm proceeds prior to actual realization thereof, for under section 126 the tax is not imposed until the amount is received by the successor.[12]

■ We find no merit in the suggestion that the gross income here referred to is limited to income from personal services. The language of section 126 (a)(3), previously mentioned, discloses that it cannot be confined to any particular type or kind of income. For by that subsection "the amount includible in gross income under paragraph (1) or (2) shall be considered in the hands of the estate or such person to have *the character* which it would have had in the hands of the decedent if the decedent had lived *and received such* amount." (Emphasis added.) This clearly discloses that income from all sources was contemplated, including capital gains,[13] business income, interest, dividends, and the like; in short, income of the various types mentioned in section 29.22(a)–1 of Regulations 111. For this reason the O'Daniel case cannot be distinguished from this one on the ground that it involved income from personal services.

We perceive no difference between what O'Daniel's employer did in paying his estate the bonus, and what the cooperatives did in paying respondent taxpayer the proceeds of the wine pool. After decedent had delivered his grapes to the associations all he had remaining was a right to collect sums of money, the amounts of which awaited the event of marketing. To say the expected proceeds would be income in respect of the decedent if the transaction was a sale, but not if it was a consignment, would be to apply an irrelevant test.[14]

To make the decision turn on the label applied by the California courts to the relationship of decedent to the cooperatives is to disregard the fact that we have here a federal law designed to deal with broad concepts of income. In terms of realities there is no reason for distinguishing, tax-wise, between these particular contracts and others which the California courts might label otherwise. Our problem is one of federal law.[15] In just as real a sense these proceeds would have become income to the decedent had he lived to receive them, whether they be called sales or something else. We hold that these proceeds received in 1945 were income in respect of a decedent under section 126.

■ The remaining questions relate to the amounts received from the pools in 1944. The Tax Court, relying on our decision in Huesman's Estate v. Commissioner, 9 Cir., 198 F.2d 133, held that this was not income in respect of a decedent which could be taxed to the petitioner under section 162(c) of the Internal Revenue Code, 26 U.S.C.A. § 162(c).

12. See note in 65 Harvard Law Review, 1024, at p. 1032.

13. Sen.Rep.No.1631, 77th Cong. 2nd Sess. 1942–2, Cum.Bull. p. 580: "Since this section provides for the treatment of such amounts as income to the persons placed in the same position as the decedent with respect to such amounts, the provisions of section 113(a) (5) with respect to the basis of property do not apply to these amounts in their hands." In substantially the same words is Reg. 111, section 29.126–1. Thus the cost basis to the estate or legatee would be the decedent's cost basis, not the value on date of death.

14. Frequently, to supply a practical solution as to who should have to stand a loss following fire or bankruptcy, courts make their decisions turn on whether, or when, a sale occurred. No similar compulsion requires such a line to be drawn here.

15. Lyeth v. Hoey, 305 U.S. 188, 193, 59 S. Ct. 155, 83 L.Ed. 119; Estate of Putnam v. Com'r, 324 U.S. 393, 395, 65 S.Ct. 811, 89 L.Ed. 1023.

(This holding is not challenged by petitioner.) But with respect to those amounts which were received by decedent's estate in 1944 from wine pools which remained unliquidated at decedent's death, and which were currently distributed to respondent in that year, it held that they were sums received by her from the sale of capital assets and that the excess over the basis fixed by section 113 for "Property transmitted at death", was taxable as a capital gain.

The court arrived at this result by holding that what was termed in the Huesman case the "corpus" of the estate, and which respondent acquired by decedent's will, was an equitable interest in the grapes and grape products in the hands of the cooperatives. These, said the court, were capital assets. Their basis was their valuation for estate tax purposes, and the sales by the wineries produced a gain, which was so taxable.

Petitioner here, arguing from Osenbach v. Commissioner, 4 Cir., 198 F.2d 235, and Hatch v. Commissioner, 14 T.C. 237, asserts that what decedent had, and left to respondent, was a mere contract right with respect to the proceeds of sales when made, and that respondent made her gain merely from the collection of the sums payable under that contract; that the gain was not from the sale or exchange of respondent's claim or contract right, and hence the gain was taxable as ordinary income under the rule of the Osenbach case, supra.

We think that the Tax Court's findings as to the character of these 1944 receipts, was not clearly erroneous, and we sustain its determination that these were capital gains. U. S. v. Cumberland Public Service Co., 338 U.S. 451, 456, 70 S.Ct. 280, 94 L.Ed. 251.

■ There is, however, one item of the 1944 collections upon which our opinion differs from that of the Tax Court. Among the sums received by the estate in 1944 was $14,047.19, decedent's share of the East-Side Winery's 1942 pool. The wine in this pool had been sold in 1943. The court held that when these proceeds were paid in 1944, it was "in the nature of payment of a claim held by the decedent against East-Side Winery and no part thereof was income of the estate in 1944." The court held: "Accordingly, we hold that no part of this payment was distributive income of petitioner in 1944."

We cannot approve this conclusion. Decedent made his returns on the cash basis. He did not receive this income prior to his death. It was not constructively received, for it could not "be drawn upon by him at any time" and its receipt was not "within his own control and disposition." [16] The agreement with the winery provided that settlements with the grower "shall be made at such time or times as the Board of Directors may elect." [17]

We hold that the gains from this payment from East-Side Winery was distribution of income to respondent in 1944. And since it was not from the sale or exchange of the estate's or respondent's claim or chose in action, but resulted from the collection only, the gain is taxable as ordinary income. Osenbach v. Commissioner, supra.

The cause is remanded with directions to modify the judgment in accordance with this opinion.

16. The quoted phrases are from Regulations 111, 29.42-2.

17. The Winery's auditor testified: "Q. When, with respect to the date of December 31, 1943, was that balance actually determined? A. That probably is very close to the transmittal letter which is April 29, 1944, and I would say 30 days prior to that date."