ESTATE OF CHARLEY W. PETERSON, DECEASED, DELLA E. PETERSON AND CHARLES R. PETERSON, COEXECUTORS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2405–78.     Filed July 7, 1980.

*John E. North* and *John A. O'Malley*, for the petitioners.
*Albert B. Kerkhove*, for the respondent.

HALL, *Judge:* Respondent determined a $225,208.33 deficiency in petitioners' 1973 taxable year income tax. Due to concessions by petitioners, the sole issue for decision is whether the sale of cattle by the Estate of Charley W. Peterson constituted "income in respect of a decedent" within the meaning of section 691(a)(1).[1]

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Charley W. Peterson (hereinafter referred to as the decedent) died testate on November 9, 1972.

Della E. Peterson and Charles R. Peterson, the petitioners herein, are the coexecutors of the Estate of Charley W. Peterson. Petitioners resided in Atkinson, Nebr., when they filed their petition in this case.

Della E. Peterson signed the estate's fiduciary income tax return (Form 1041) for the taxable year beginning November 9, 1972, and ending October 31, 1973.

The decedent raised and sold cattle for at least 45 years prior to his death. On July 11, 1972, the decedent and the Max Rosenstock Co. entered into the following livestock sales contract (Rosenstock contract):

### LIVESTOCK SALES CONTRACT

THIS AGREEMENT, made and entered into this 11 day of July, 1972, by and between Charley W. Peterson, Atkinson, Nebraska, as party of the first part, Owner, and Seller, and Max Rosenstock Company, of Sioux City, Iowa, party of the second part, and Buyer, WITNESSETH:

That the party of the first part has this day agreed to sell and deliver to the second party, and the second party has agreed to purchase, receive and pay for the livestock hereinafter described, upon the terms and conditions set forth following, viz:

The livestock consists of approximately three thousand three hundred head

---

[1]All statutory references are to the Internal Revenue Code of 1954 as in effect during the year in issue.

of calves, primarily of Angus and Angus Charolais cross breeding, raised by the first party.

Second party agrees to pay to first party a price of Forty-nine Cents (49¢) per pound, live delivery weight, for both Steers and Heifers, computed on the total weight of the whole lot of cattle.

As an earnest payment, second party has this day paid to first party, the sum of $46,500.00, which shall be applied as a credit against the whole sum of money which may be due.

The described calves are now situated on ranches in Brown County and Holt County, in Nebraska. Second party acknowledges that it has personally inspected and examined the calves the subject of the contract, and is informed concerning the type, quality, breeding, size and approximate ages of the calves.

At the time of weighing, and computation of the total sale money, second party is to be allowed an additional credit against the purchase price in the amount of Two Thousand One Hundred Sixty dollars as a compensation for the number of heavier than average calves which may be included in the lot.

Simultaneously with the final weighing and delivery of the calves, and the determination of the net remaining balance of the sale moneys due to first party, second party in discharge thereof, agrees to execute and deliver to first party, its promissory note in the amount of such balance, which shall be due and payable January 5, 1973, which shall draw no interest until January 5, 1973, and thereafter shall draw interest at the rate of nine per centum per annum until paid. For the security of said note, second party also agrees to execute and deliver to first party a Security Agreement, and a financing statement covering the livestock sold, which shall be in conformity with the Uniform Commercial Code of Nebraska, and grant to first party a continuing first lien upon such livestock until such note is paid. Second party shall furnish first party with an accurate list of the locations and places where said livestock will be kept after delivery.

Second party shall not be entitled to sort or size such livestock, but shall not be required to accept any livestock which have obvious defects or infirmities, or such as may be sick or crippled, or fail to pass health certification requirements.

First party shall have the right to designate the delivery dates of lots of cattle, which in the case of cattle now located on Brown County ranches shall not be later than November 1, 1972, and as to cattle on Holt County ranches shall not be later than December 15, 1972. First party agrees to notify Second party five days in advance of selected delivery dates.

As to the cattle which are located in Brown County, the same will be assembled in corrals at the ranch, and trucked directly to weigh stations in Ainsworth, Nebraska, and weighed off-truck, without allowance for shrink, which weights shall constitute the basis of payment. Transportation from ranch corrals shall be at expense of Second party.

As to the cattle which are located in Holt County, the same will be assembled for delivery in corrals at one or more locations of P & P Farms within a radius of 15 miles of Atkinson, Nebraska, and calves will then be removed from Cows and immediately weighed, without allowance for shrink, upon scales at such locations, which weights shall constitute the basis of

payment. Second party will take delivery of the cattle at these locations after weighing, and all transportation thereafter shall be at expense of second party.

It is understood and agreed that the calves located in Holt County, will be moved from pasture to Corn Stalk fields, and remain with Mother Cows until delivery time.

Second party shall have made available to it, the use of any P & P Farms corrals at the various locations, for purpose of sorting and sizing any livestock prior to trucking.

All calves originating in Holt County will be branded, vaccinated and castrated. All calves with [sic] carry the registered Lazy F Brand, and will be the produce of Charley W. Peterson, excepting approximately 400 head of the total lot, which will be of the production of Willis Peterson.

First party will furnish all brand clearances and necessary health inspections and certification.

All communications having to do with this contract to first party shall be made through Charles R. Peterson, mailing address Amelia, Nebraska, and to second party through Emmet Brickley, Valentine, Nebraska, respective agents for the parties.

IN WITNESS WHEREOF, the parties have affixed their signatures the day and year first above written.

(S)   Charley W. Peterson
_____
CHARLEY W. PETERSON

MAX ROSENSTOCK COMPANY

By: (S)   R. E. Brickley
_____
R. E. BRICKLEY

On July 13, 1972, R. E. Brickley (Brickley), the agent for the Max Rosenstock Co., mailed to the decedent a $46,500 check as provided for in the sales contract.

Brickley first met the decedent in 1927 or 1928 and their first business transaction occurred the following year. A solid and satisfactory business relationship existed between these two individuals. Out of these prior dealings evolved the following understanding: (1) The decedent would deliver only calves that were old enough to wean but not yet yearlings, i.e., between 3 months and 11 months old; and (2) the decedent would allow Brickley to turn down any calves that he considered unmerchantable, diseased, too young, or too old. Because of the decedent's familiarity with Brickley's requirements, he generally culled those calves he thought would be unsatisfactory to Brickley prior to making any deliveries.

The Rosenstock contract provided for the sale of approximately 3,300 head of calves. The contracting parties used an approximation due to the difficulty of determining the number

of acceptable calves that would be available at the time of delivery. The 3,300 head of calves represented the decedent's estimate of what he thought he could supply to Brickley.[2] Because of this situation, Brickley knew that the number of calves eventually delivered might be less than the approximation contained in the Rosenstock contract.

The terms of the Rosenstock contract permitted the decedent to select the dates for delivering the calves so long as those dates were prior to November 1, 1972, for the calves raised in Brown County and prior to December 15, 1972, for the calves raised in Holt County. The decedent bore the risk of loss until the calves were delivered.[3]

The decedent raised the calves and paid the associated expenses until his death. The decedent died on November 9, 1972, without having delivered any calves or having designated any of the delivery dates under the Rosenstock contract. After the decedent's death, the estate assumed the raising and feeding of the calves, and paid the associated expenses. Charles R. Peterson, as coexecutor of his father's estate, designated the delivery dates under the Rosenstock contract. These dates ranged from December 8 to December 15, 1972. Prior to delivery, the estate culled 328 calves because it was believed they would not have satisfied Brickley's requirements. As a result of this predelivery culling, Brickley rejected very few of the delivered calves. A total of 2,929 calves were accepted by Brickley under the Rosenstock contract. The decedent's estate owned 2,398 of these calves, and the decedent's sons owned the remaining 531 calves.[4]

Each delivered calf gained approximately one-half to 3 pounds

---

[2]Because the decedent's cows calve year round, some of the calves that would eventually be delivered under the Rosenstock contract were not yet born as of July 11, 1972. Furthermore, it was not known how many calves the decedent possessed on July 11, 1972. A head count was a difficult task to undertake and Brickley did not require it. Brickley, however, inspected a portion of the herd on or about July 11, 1972.

It was evidently the decedent's prior practice with Brickley to include some of his sons' calves in any given delivery, whether or not the contract specifically provided for it. (Both of the decedent's sons, Charles R. and Willis, raised cattle.) Brickley viewed these calves as "Peterson calves" and, therefore, he was not concerned whether they belonged to the decedent or to the decedent's sons. In fact, the Rosenstock contract clearly provided that approximately 400 head were to be supplied by Willis Peterson.

[3]The decedent and his estate bore the risk of any loss including that arising from the following hazards: adverse weather, anthrax, dust pneumonia, hoof rot, and red nose.

[4]Willis Peterson owned 468 calves and Charles R. Peterson owned 63 calves.

per day between November 9, 1972, and the designated delivery dates. On November 9, 1972 (the date of the decedent's death), approximately two-thirds of the 2,398 calves owned by the decedent were deliverable insofar as they would have satisfied Brickley's requirements; the other one-third would have been rejected if delivered on that date because they were too young to be weaned.

The record contains no explanation of why decedent did not deliver the Brown County calves on or before November 1, 1972. The calves were not in fact delivered until December, at which time Brickley accepted them. Brickley's waiver of the November 1 delivery date resulted in an implied modification of the contract.

In February 1974, the estate filed a U.S. Fiduciary Income Tax Return (Form 1041) on which it reported the sale of 1,479 calves to the Max Rosenstock Co. The estate computed the gain on this sale by subtracting the fair market value of the calves on November 9, 1972, from the sale proceeds. Petitioners now concede that the sale of an additional 919 calves (bringing the total to 2,398) should be reported.

In his statutory notice, respondent determined that the gain realized from the sale of calves to the Max Rosenstock Co. constituted "income in respect of decedent." Accordingly, respondent recomputed the estate's gain on the sale by subtracting the decedent's adjusted basis in the calves from the sale proceeds.

## OPINION

The sole issue for decision is whether the proceeds from the sale of 2,398 calves received by the Estate of Charley W. Peterson constituted "income in respect of a decedent" as that term is used in section 691. That section, in pertinent part, provides:

The amount of all items of gross income in respect of a decedent which are not properly includible in respect of the taxable period in which falls the date of his death or a prior period (including the amount of all items of gross income in respect of a prior decedent, if the right to receive such amount was acquired by reason of the death of the prior decedent or by bequest, devise, or inheritance from the prior decedent) shall be included in the gross income, for the taxable year when received, of:

(A) the estate of the decedent, *if the right to receive* the amount is acquired by the decedent's estate from the decedent; * * * [Emphasis added.]

Section 1.691(a)–1(b), Income Tax Regs., defines "income in respect of a decedent" as:

those amounts to which a decedent was *entitled* as gross income but which were not properly includible in computing his taxable income for the taxable year ending with the date of his death or for a previous taxable year under the method of accounting employed by the decedent. * * * Thus, the term includes:

(1) All accrued income of a decedent who reported his income by use of the cash receipts and disbursements method;

(2) Income accrued solely by reason of the decedent's death in case of a decedent who reports his income by use of an accrual method of accounting; and

(3) Income to which the decedent had a contingent claim at the time of his death.

[Emphasis added.]

Respondent contends that the sale proceeds in issue were income in respect of Charley W. Peterson (hereinafter referred to as the decedent) because, as of the date of his death, the decedent was entitled to receive those proceeds. Respondent claims that the decedent's entitlement arose from a combination of two factors, the livestock sales contract executed on July 11, 1972, between the decedent and the Max Rosenstock Co. (hereinafter referred to as the Rosenstock contract) and the activities performed by the decedent pursuant to the contract. As a result of his determination, respondent asserts that the estate should report as income the difference between the sale proceeds and the decedent's adjusted basis in the calves. See sec. 1014(c).[5]

On the other hand, petitioners contend that the criterion for determining whether an item constitutes income in respect of a decedent is whether the decedent "performed under the contract to the extent that a fixed, legal right at death exists, which will ultimately result in payment without any conditions precedent or contingencies with respect to the decedent's performance." Petitioners argue that when the decedent died on November 9, 1972, he did not possess such an unconditional right to the sale proceeds. Rather, petitioners assert that it was the postdeath

---

[5]Sec. 1014(a) generally provides that the basis of property in the hands of a person acquiring the property from a decedent shall be the fair market value of the property at the date of the decedent's death. However, sec. 1014(c) provides that the above statutory provision "shall not apply to property which constitutes a right to receive an item of income in respect of a decedent under section 691."

activities of the estate that consummated the sale and gave rise to the accompanying entitlement to the proceeds. Accordingly, petitioners claim that the sale proceeds were not income in respect of the decedent and that the estate must recognize as income only the difference between the sale proceeds and the fair market value of the calves as of November 9, 1972. See sec. 1014(a).[6] For the reasons stated below, we agree with petitioners.

Prior to 1934, under judicial interpretation of then-existing revenue statutes, income which had accrued to a cash basis taxpayer at the time of death was not taxable to him and such accrued income could subsequently be collected by his estate without the payment of any income tax. A taxpayer on the accrual method of accounting, however, was required to pay income taxes both on what he received and what was accruable to him on the date of his death. Congressional concern with this discrimination between cash and accrual basis taxpayers and the associated loss of revenue led to the enactment of section 42 of the Revenue Act of 1934. See 48 Stat. 680. This section required all income accrued to the date of death but not otherwise properly includable in income for that period, or any prior period, to be included in the decedent's income tax return for the period ending with his death, regardless of his method of accounting. See S. Rept. 558, 73d Cong., 2d Sess. 28 (1934), 1939–1 C.B. 586, 608.

While this section achieved an equality between cash and accrual basis decedents, it resulted in a bunching of income because amounts which would have been received over several years and taxed at lower rates were required to be reported in the year of death. This situation was aggravated by the Supreme Court's decision in *Helvering v. Enright*, 312 U.S. 636 (1941), which greatly expanded the meaning of "accrued," as used in section 42, beyond the accounting concept of accrual now encompassed in the "all events" test. Sec. 1.446–1(c)(1)(ii), Income Tax Regs. According to the Supreme Court, an expansive definition of "accrual" comported with the legislative objective of ensuring that income which would have been taxable had the decedent lived to receive it should not escape

---

[6]See n. 5 *supra.*

income tax simply by reason of the decedent's death. 312 U.S. at 644–645.

Section 134 of the Revenue Act of 1942 added section 126 of the 1939 Internal Revenue Code. See 56 Stat. 798. This section, the predecessor of section 691 of the Internal Revenue Code of 1954, eliminated the undesirable pyramiding effects of the prior law through formulation of the concept of "income in respect of decedent." Under this section, income accruing to a decedent because of his death was not to be included in his final return, but was to be treated as income and reported as such by the person receiving the income.

Although the present statute describes how income in respect of a decedent is to be reported, nowhere does it define what it is.[7] The only definition appears in section 1.691(a)–1(b), Income Tax Regs., but a reading of that definition readily demonstrates its imprecision. As a result, the courts have been called upon to establish the dimensions of the term.

Certain general propositions have evolved from prior cases. For income to be considered "income in respect of a decedent," section 691 requires that the decedent possess a *right* to that income as of the date of death. See *Estate of Sidles v. Commissioner*, 65 T.C. 873, 880 (1976), affd. without opinion 553 F.2d 102 (8th Cir. 1977).[8] This right to the income is not limited to those items which, on the date of decedent's death, would satisfy the requirements of the "all events" test of accrual tax accounting. Rather the expansive view of "accrual" established in *Helvering v. Enright* has been subsumed by section 691. See *Commissioner v. Linde*, 213 F.2d 1, 6 (1954); *Estate of Davison v. United States*, 155 Ct. Cl. 290, 292 F.2d 937, 940–941 (1961). Whether a decedent possesses a right to certain income on the date of his death must be determined on a case-by-case basis upon "the subsisting facts." *Trust Co. of Georgia v. Ross*, 392 F.2d 694, 695 (5th Cir. 1967), cert. denied 393 U.S. 830 (1968). One of the facts to be considered is whether the income received

[7]An attempt to add a statutory definition in 1959 failed. H.R. 3041, 86th Cong., 1st Sess. (1959).

[8]"It is implicit in the statute and in the definition that this * * * [right or entitlement] has reference to the date of death of the decedent. That is, income is to be included if decedent was entitled to the income at the date of his death. * * * [*Trust Co. of Georgia v. Ross*, 392 F.2d 694, 696 (5th Cir. 1967), cert. denied 393 U.S. 830 (1968).]"

after death resulted from the decedent's activities during his lifetime. But this right must be distinguished from the activity which created it, for no matter how great that activity was, there can be no income in respect of a decedent under section 691 unless the decedent possessed a right to receive such income on his death. *Trust Co. of Georgia v. Ross, supra* at 695. The problem in the instant case is to apply these abstract and general propositions to the facts before us. As succinctly stated elsewhere:

> At times, it may be difficult to determine whether the decedent's steps prior to his death had proceeded sufficiently to treat sales proceeds received after death as income in respect of a decedent. The test here is not quite whether the decedent "closed" the sale or transferred title and possession of an asset before death. Rather, it is whether his successor acquired a right to receive proceeds from an asset's disposition on the one hand, or acquired the asset itself on the other. Depending upon the subject and terms of a sale, death may interrupt the transaction at a number of stages which do not fall clearly on either side of this rather murky distinction. The result has been frequent litigation and critical commentary on its results. Despite its importance, the test still defies easy application in a given case. [M. Ferguson, J. Freeland & R. Stephens, Federal Income Taxation of Estates and Beneficiaries 178–179 (1970).]

Our examination of the prior cases involving postdeath sales proceeds and the applicable portions of the regulations under section 691 has distilled at least four requirements which have been applied to test whether a decedent possessed the requisite right to sales proceeds at the time of his death.[9]

The first requirement is that the decedent must have entered into a legally significant arrangement, e.g., a contract, regarding the disposition of the subject matter of the sale. This arrangement may take a variety of forms: an express executory contract of sale (see *Trust Co. of Georgia v. Ross, supra;* Rev. Rul. 78–32, 1978–1 C.B. 198); an implied contract of sale (e.g., if X, a decedent, delivered unsolicited apples to Y, who accepted the apples but had not paid for them prior to X's death); or a contractual arrangement with a cooperative marketing association (see *Commissioner v. Linde, supra*). The significance of

---

[9]The list of requirements is not meant to be an ironclad formulation of the hurdles which an item of income must clear before it will be categorized as income in respect of a decedent. The innumerable types of sales transactions and the different stages at which the seller's death may intervene, make any formulation of a list of criteria susceptible to change. Yet this list represents the present status of the law and is a reasonable line of demarcation considering the potentially broad scope of the statute.

these arrangements is to elevate the decedent's right beyond the level of a mere expectancy.[10] Cf. *Estate of Burnett v. Commissioner*, 2 T.C. 897 (1943), cited in Rev. Rul. 58–436, 1958–2 C.B. 366, modified on other grounds in Rev. Rul. 64–289, 1964–2 C.B. 173. (The "mere ownership" of livestock or harvested crops which were marketable on the date of decedent's death does not constitute income in respect of a decedent.)

The second requirement is that the decedent has performed the substantive (nonministerial) acts required of him as preconditions to the sale, i.e., the subject matter of the sale was in a deliverable state on the date of the decedent's death. The nature and scope of the decedent's activities will depend on the subject matter of the sale. For instance, the decedent's activities associated with a sale of corporate stock will be substantially less than the activities associated with the building and sale of a house or the raising and sale of crops. Whereas the acts required of a decedent to make stock deliverable are generally ministerial in nature (see *Estate of Sidles v. Commissioner*, 65 T.C. 873, 881 (1976), affd. without opinion 553 F.2d 102 (8th Cir. 1977)), the same is not true for the house or crops which require the sweat of the decedent's brow. The decedent's right will not sufficiently ripen for purposes of section 691 if the decedent has not performed the substantive acts required of him as a precondition to the sale.[11] In other words, the estate's right to sale proceeds must derive from the decedent's death and not from its own efforts. See *Estate of Sidles v. Commissioner, supra* at 881.

One indicium of whether a decedent has performed the applicable substantive acts is whether he has delivered, or somehow placed, the subject matter of the sale beyond his control prior to his death. Thus a predeath delivery to the purchaser (see sec. 1.691(a)–2(b) (example (5)(1)), Income Tax Regs.), to an escrow agent (see *Trust Co. of Georgia v. Ross*, 262 F. Supp. 900 (N.D. Ga. 1966), affd. 392 F.2d 694 (5th Cir. 1967)),

---

[10]Whether an arrangement that is legally significant for purposes of determining the existence of income in respect of decedent must also be legally enforceable is not decided here. Cf. *O'Daniel's Estate v. Commissioner*, 173 F.2d 966 (2d Cir. 1949) (involving a postdeath bonus). See *Estate of Sidles v. Commissioner*, 65 T.C. 873, 888 (1976) (Judge Hall's concurring opinion).

[11]For example, if X, the decedent, enters into an executory contract to sell the crops to be grown next season on X's farm and X dies prior to the plowing and seeding of his fields, no one would argue that the proceeds from the crop sale were income in respect of a decedent.

or to a cooperative marketing association (see *Commissioner v. Linde, supra* ) indicates that the decedent has performed the necessary substantive acts. However, the absence of delivery or otherwise placing the subject matter beyond the decedent's control does not preclude a finding that the sale proceeds are income in respect of a decedent.[12]

The third requirement is that there existed, at the time of the decedent's death, no economically material contingencies which might have disrupted the sale. For example, if a sale is contingent on a nonroutine or nonperfunctory approval by the Interstate Commerce Commission and such approval has not been given prior to the decedent's death, the sale proceeds are not income in respect of a decedent. See *Keck v. Commissioner*, 415 F.2d 531, 534 (6th Cir. 1969), revg. 49 T.C. 313 (1968) ("the sale of the stock was subject to a number of contingencies; that it was, at that time, subject to the approval of the Interstate Commerce Commission, a condition precedent which was not met until eighteen months after decedent's death, and that such approval was neither routine or perfunctory"); *Estate of Sidles v. Commissioner*, 65 T.C. 873, 889–890 (1976) (Judge Tannenwald concurring in part and dissenting in part). In this respect, the test departs from the "all events" test of accrual accounting, which is normally not met even if a remaining contingency which would preclude receipt is sufficiently remote as not to have economic materiality.

The fourth requirement is that the decedent, himself, would have eventually received (actually or constructively) the sale proceeds if he had lived. This situation may be best exemplified by a typical date-of-death buy-sell agreement between a decedent and his corporation; since, by its terms, the sale is only effective upon the decedent's death, the decedent could not have received the sale proceeds if he had lived. Therefore, the proceeds from such a sale are not income in respect of a decedent. See sec. 1.691(a)–2(b) (example (4)), Income Tax Regs.

The facts and circumstances of this case lead us to the conclusion that the proceeds received by the decedent's estate on the sale of the 2,398 calves did not constitute income in respect of a decedent within the meaning of section 691. In reaching this

---

[12]For example, the result in *Trust Co. of Georgia* would not be any different if the decedent in that case had held his stock until death rather than placing it with an escrow agent.

conclusion, we have considered the four requirements delineated above.

Initially, the facts indicate that the decedent entered into an executory sales contract, i.e., a legally significant arrangement, with the Max Rosenstock Co. for the sale of calves. This characterization is contrary to petitioners' assertion that the Rosenstock contract did not represent a valid executory sales contract. Rather, petitioners view the Rosenstock contract as creating "illusory" obligations on the contracting parties much in the nature of an option to buy or sell. Petitioners' position appears to stem from a combination of three factors[13] —the decedent's relative freedom to select delivery dates, the buyer's ability to reject any calves which he considered to young, too old, or unmerchantable, and the imprecise number of calves to be sold.

There is no dispute between the parties that the Nebraska version of the Uniform Commercial Code (UCC) is applicable to the Rosenstock contract. Using the UCC as our guidepost, we have no doubt that the Rosenstock contract was a valid executory sales contract. The UCC takes a very liberal view of contract formation. In pertinent part, sec. 2–204, Neb. Rev. Stat. (1971 reissue), provides:

(1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

\* \* \* \* \* \* \*

(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

This provision applies both to present sales and to contracts for sale of goods at future dates. See Neb. Rev. Stat. sec. 2–106(1) (1971 reissue).

None of the provisions of the Rosenstock contract cited by petitioners supports their position that performance by either party to the contract was optional. Although the delivery dates were not specifically spelled out in the contract, the decedent was obligated to deliver prior to December 15, 1972. Further-

---

[13]The lack of specificity as to petitioners' arguments makes it difficult to clearly discern the foundation of these arguments.

more, even though the buyer possessed the right to reject calves, this right was not unbridled. Rather, the buyer could only reject calves which were too young, too old, or unmerchantable and, even then, these rejection rights were tempered by a "good faith" obligation. See Neb. Rev. Stat. secs. 1–203, 2–103(1)(b) (1971 reissue). Moreover, although the contract only approximated the number of calves to be delivered, the use of an estimate did not mean that either party was free to disavow his obligation under the contract. See 67 Am. Jur. 2d 282–283 (1973). The decedent had a good-faith obligation to deliver approximately 3,300 calves, and the buyer had a good-faith obligation to accept those calves, assuming they met his requirements. See Neb. Rev. Stat. sec. 1–203 (1971 reissue).

In sum, petitioners have failed to convince us that the title of the agreement "Livestock Sales Contract" is a misnomer. Rather, the terms of the agreement and the prior dealings between the parties for almost 50 years[14] support our finding that the parties created a valid executory sales contract.[15]

Second, at the time of the decedent's death there existed no economically material contingencies which could potentially disrupt the sale. While it is true that the calves could have been destroyed by disease, etc., prior to delivery, so that the "all events" test would not have been met, petitioners failed to prove that this was anything but a remote possibility. Therefore, potential destruction of the subject matter of the sale did not pose a "real" or "significant" obstacle to the completion of the sale.

Third, the decedent would have received the proceeds of the sale had he lived since the terms of the sale did not make it effective only upon the decedent's death.

Although three of the four requirements tend to support a conclusion opposite to the one reached, all four elements are

---

[14]See Neb. Rev. Stat. secs. 1–205(1), 2–204 (comment) (1971 reissue).

[15]Petitioners briefly mention that the Rosenstock contract may be viewed as an "output" contract under sec. 2–306, Neb. Rev. Stat. (1971 reissue), but they do not explain what significance this characterization would have. Even assuming the Rosenstock contract were classifiable as an output contract, there is no reason why such a contract would not suffice to create a legally significant arrangement.

necessary to support a finding that the decedent possessed a right to the sale proceeds as of his date of death.[16] Accordingly, the absence of one of these requirements precludes the applicability of section 691.

The missing link in this case is the decedent's failure to perform the substantive acts required under the Rosenstock contract. As a precondition to the sale of the calves and consequently, to the receipt of the sale proceeds, it was necessary for the decedent to raise and feed the calves so that they would satisfy the terms of the Rosenstock contract.[17] One such term was that the calves be between 3 months and 11 months old at the time of delivery.

We have found as a fact that of the 2,398 calves eventually delivered by the decedent's estate under the Rosenstock contract only two-thirds were deliverable as of November 9, 1972, the date of the decedent's death. The remainder were too young for delivery. Viewed in its entirety[18] and as impliedly modified by the parties,[19] the contract was not deliverable on November 9, 1972.

The premature status of such a significant number of calves required the decedent's estate to continue the raising and feeding of the calves. Each delivered calf gained approximately one-half to 3 pounds per day between the date of decedent's death (November 9) and the delivery date in December. Had the estate not daily fed, watered, and cared for the calves from the date of decedent's death until the delivery date, these calves would have perished. The activities performed by the estate were not perfunctory or ministerial but substantial and essential acts not performed by the decedent prior to his death. In sum, the estate's right to the sale proceeds derived from its own efforts as well as those of the decedent. This contribution by the estate is sufficient to remove the sale proceeds from the reach of

---

[16]See n. 9 *supra*.

[17]The terms of the Rosenstock contract included those terms which evolved from the course of dealings between the decedent and Brickley. See Neb. Rev. Stat. sec. 1-205(1), (4) (1971 reissue).

[18]Neither party contends that the Rosenstock contract was divisible.

[19]The written contract required decedent to deliver the Brown County calves on or before Nov. 1, 1972. The calves were not in fact delivered until December at which time Brickley accepted them. Brickley's waiver of the Nov. 1 delivery date resulted in an implied modification of the contract. See Neb. Rev. Stat. sec. 2-206 (1971 reissue).

section 691. Cf. *Trust Co. of Georgia v. Ross, supra* at 696. ("It is true that some aspects of the transaction which the contract contemplated had to be performed by [the decedent's] executor but these were not of such scope as would negate the right which was [the decedent's] under the contract.")[20]

Respondent does not deny the estate's role in the sale of the calves. Rather, respondent argues that we should focus on the substantial activities undertaken by the decedent to fulfill the Rosenstock contract and the status of those efforts at the time of his death. At the time of the decedent's death, two-thirds of the 2,398 calves were deliverable under the contract and the remaining one-third were in existence.[21] We do not doubt that the decedent's efforts contributed far more to the completion of the contract than those of the estate, but a weighing of the relative efforts is not the test envisioned by section 691. See *Trust Co. of Georgia v. Ross, supra* at 695. Under respondent's formulation, any work-in-progress which was the subject of a predeath contract of sale could constitute income in respect of a decedent if the major part of the work had been completed prior to the decedent's death. The statute, however, does not reach so broadly. As noted in *Commissioner v. Linde, supra* at 5 (9th Cir. 1954): "We think it clear that the intent of Congress [in section

---

[20]See *Estate of Sidles v. Commissioner, supra* at 881:

"There can be no doubt that the estate acquired the right to receive the liquidation distribution from the decedent. The estate's right to such proceeds derived solely from the decedent's death and not from its own efforts. Whatever actions the estate took were of no material significance here."

[21]In support of his position, respondent cites the language of regulations section 1.691(a)–1(b), which states that income in respect of a decedent includes "Income to which the decedent had a contingent claim at the time of his death." In his brief, respondent states:

"Respondent's regulation is a reasonable interpretation of the statute. It looks not only to that which the decedent was entitled but also to that which he had a contingent claim. In so doing, it reflects the intent of Congress to go beyond the test of receipt for cash basis taxpayers or the all events test for accrual basis taxpayers. The regulation reflects Congress' intent that a decedent's income be fairly reflected."

We agree that the phrase "contingent claim" as used in respondent's regulation is reflective of congressional intent to go beyond the "all events" test, but this does not mean there is no limit to the scope of that phrase or that the facts of this case are not beyond that limit. Clearly, not all "contingent" claims held by a decedent at the time of his death are within the purview of sec. 691. See *Keck v. Commissioner*, 415 F.2d 531 (6th Cir. 1969), revg. 49 T.C. 313 (1968). On the other hand, that phrase does properly include such "contingent" claims as renewal insurance commissions. See *Latendresse v. Commissioner*, 26 T.C. 318 (1956), affd. 243 F.2d 577 (7th Cir. 1957). On balance, respondent's regulation is no more enlightening than the legislative history previously outlined and, accordingly, we are left to chart our own course in the murky waters of sec. 691.

691] continued to be as stated in the *Enright* case 'to cover into income the assets of decedents, *earned* during their life and unreported as income.' " (Emphasis supplied.) See also *Estate of Sidles v. Commissioner, supra* at 879. Although the legislative history of section 691 indicates that it is not necessary for an item to have been *earned* by the decedent in any tax reporting sense or in any technical accounting sense, we believe the use of the term "earned" is appropriate insofar as it connotes the practical completion of a transaction. While there is some imprecision in this commonsense approach, it is more precise than respondent's formulation which we find to be "open-ended and somewhat inadequate as a precedent when considered in the scope of the statute." *Trust Co. of Georgia v. Ross, supra* at 695.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

SIMPSON, *J.*, concurring: I accept the result reached by the majority since the Commissioner never sought to allocate the proceeds from the sale of the calves between those calves which were deliverable at the date of the decedent's death and those not so deliverable.[1] However, I disagree with the majority's opinion. Such opinion appears to indicate that, as a matter of law, none of the proceeds from the sale of the calves is income in respect of a decedent since some of such proceeds do not constitute such income. Such opinion overlooks the basic proposition that under section 691, income earned by a decedent is to be subject to the income tax and not exempt from such tax by giving it a stepped-up basis under section 1014(a). The Court finds that two-thirds of the calves were deliverable on the date of the decedent's death, and as to those calves, virtually all of

---

[1]Had this case been presented to me, I would have given serious consideration to requesting the parties to consider an allocation of the proceeds and offering them a further trial if necessary to present additional evidence relating to a proper allocation of the proceeds. It might have been preferable to pursue such a course rather than to proceed to announce and apply an unsound construction of sec. 691. However, the question of whether to decide the case as presented or to request further development of it is a matter of judicial discretion, and I accept Judge Hall's decision on this matter.

the income from their sale was earned during the lifetime of the decedent. I agree that the income attributable to the sale of the other one-third is not income in respect of a decedent, but that fact should not have the effect of exempting all the proceeds from the sale of the calves from income tax.

In *Davison's Estate v. United States*, 292 F.2d 937 (1961), the Court of Claims was concerned with whether crop rentals in cash or in kind should be treated as income in respect of a decedent. After reviewing the circumstances leading to the enactment of section 126 of the Internal Revenue Code of 1939, the predecessor of section 691, that court declared at page 941:

> Certainly the Congress has been concerned with removing discrimination between cash and accrual method taxpayers, and with avoiding the unfair bunching problems which arose under prior law when all sums due to a decedent were accrued to him on the date of his death. But the congress has also been concerned with retrieving lost revenue. Section 126 is intended to further the general purpose of the Internal Revenue Code that all income should pay a tax. We think it clear that the intent of the Congress in enacting this section continued to be, as stated by the Supreme Court in Enright, "to cover into income the assets of decedents, earned during their life and unreported as income." 312 U.S. at page 644, 61 S.Ct. at page 782. The income in respect of a decedent provision represents an attempt to implement these policies in a manner which reduces the importance of death in the actual collection of the revenue. * * *

In view of that understanding of the purpose of the predecessor of section 691, the court held that the crop rentals earned during the life of the decedent were income in respect of a decedent even though the amount to be realized from a sale of the crop rentals in kind could not be ascertained at the date of the decedent's death and even though such amount would vary with changes in market conditions after the decedent's death.

The boundaries of the concept of income in respect of a decedent are difficult to stake out precisely, but the circuit courts have generally emphasized the question of whether the income was earned during the life of the decedent. Income so earned is treated as income in respect of a decedent even though the decedent had no fully vested right to receive the income at the time of his death. For example, in *Commissioner v. Linde*, 213 F.2d 1 (9th Cir. 1954), the decedent, during his lifetime, produced grapes and delivered them to a cooperative for conversion into wine and for sale. The Ninth Circuit relied on the Supreme Court's opinion in *Helvering v. Enright*, 312 U.S. 636

(1941), and held that the decedent's share of the proceeds of the sale of the grapes was income in respect of a decedent since such income had been earned during the lifetime of the decedent, since such income would have been received by and taxed to him had he lived, and since the court believed that the purpose of section 691 and its predecessor was to assure that such income would not avoid taxation as a result of the death of the decedent. 213 F.2d at 5. The Ninth Circuit rejected the conclusion of the Tax Court that such proceeds were not income in respect of a decedent because the sale had not taken place during the lifetime of the decedent and because the decedent therefore had no right to such income at the time of his death.

For the reasons embraced by the Ninth Circuit in *Linde*, the Second Circuit held in *O'Daniel's Estate v. Commissioner*, 173 F.2d 966 (1949), that a bonus paid on account of the services performed by a decedent was income in respect of a decedent even though the bonus was not allocated until after his death and there was no right to it at the time of his death. The court said at page 968: "It seems apparent from what we have already said that 'the right * * * acquired by the decedent's estate from the decedent' which is referred to in Section 126(a)(1)(A) is not necessarily a legally enforceable right but merely any right derived through his services rendered while living." See also *Bausch's Estate v. Commissioner*, 186 F.2d 313 (2d Cir. 1951).

In *Riegelman's Estate v. Commissioner*, 253 F.2d 315 (2d Cir. 1958), the decedent was a member of a law partnership, and after his death, his estate had a right to share in the profits of the partnership, not only for work performed before his death, but also for some work performed after his death. The Second Circuit found that the right to all such profits was income in respect of a decedent, even for the work performed after his death, since the right to such profits was attributable to the services rendered by the decedent to the partnership. The court said at page 319: "The payments were not gifts, nor were they attributable to anything done by Riegelman's estate. They were the fruits of the man's professional activity during his lifetime;"

*United States v. Ellis*, 264 F.2d 325 (2d Cir. 1959), also involved a partnership agreement in which the estate of a deceased partner was given a right to share in the partnership profits for a period of 10 years after his death. The court held that the share of the profits received by the estate was income in respect of a

decedent because: "This contract did not result from any bargain between the surviving partners and Ellis' estate but stemmed solely from Ellis' efforts and bargaining position during his lifetime" (264 F.2d at 327.) In such situation, there was no way of knowing, at the death of Mr. Ellis, the amount of the income which would be earned by the partnership and which would be received by the estate.

The issues in this case can be more easily understood if we simplify the facts: Suppose the seller had agreed to sell two calves, one deliverable on November 1, and the other on December 15, and payment was not to be made until both calves had been delivered. If a calf had in fact been delivered on November 1, it is clear that the proceeds from the sale of that calf would be income in respect of a decedent. *Trust Co. of Georgia v. Ross*, 392 F.2d 694 (5th Cir. 1967), cert. denied 393 U.S. 830 (1968); *Commissioner v. Linde*, 213 F.2d 1 (9th Cir. 1954); *Estate of Sidles v. Commissioner*, 65 T.C. 873 (1976), affd. without opinion 553 F.2d 102 (8th Cir. 1977). Similarly, even if the one calf had not been delivered on November 1, but if it was deliverable at the date of the decedent's death, it is clear that substantially all of the conditions of the sale would have been performed before the date of the decedent's death and that the proceeds from the sale of the calf should be treated as income in respect of a decedent. *Trust Co. of Georgia v. Ross, supra; Estate of Sidles v. Commissioner, supra.* Although there were many more calves involved in this case, the applicable principles are the same, and the proceeds attributable to the calves which were deliverable at the time of the decedent's death should be treated as income in respect of a decedent.

As to the two-thirds of the calves which were deliverable at the date of the decedent's death, his efforts had earned a right to the income from their sale. Such right was "the fruits of the man's * * * activity during his lifetime" (*Riegelman's Estate v. Commissioner*, 253 F.2d at 319) and "stemmed solely from * * * [the decedent's] efforts" (*United States v. Ellis*, 264 F.2d at 327). As to those calves, actual delivery of the calves to the purchaser was all that was required to complete the sale. We do not know why none of the calves was delivered before the death of the decedent, but whether those calves were delivered was wholly within the control of the decedent and those managing his affairs. It was their decision not to deliver the calves before his

death, and their decision not to perform that ministerial act of delivery should not result in the income from the sale of such calves being exempt from income tax.[2] The opinion of the majority may lead some persons to conclude that in similar situations it is advisable to postpone the completion of a sale in order to avoid the income tax.

The effect of the opinion of the majority is to exempt from income tax the proceeds of the sale of all the calves simply because some of them were not deliverable at the time of the decedent's death. In other words, because one-third of the calves were not yet ready for delivery, none of the income earned during the lifetime of the decedent is to be subject to the income tax. In my judgment, such a result clearly frustrates the purpose of section 691. *Davison's Estate v. United States*, 292 F.2d at 941.

The conclusion of the majority cannot be justified by any administrative difficulties involved in allocating the proceeds of the sale. It is true that we may not be able to identify the actual calves which were deliverable at the time of the decedent's death and that, therefore, we do not know the prices brought by them. It is also true that such calves gained some additional weight after the death of the decedent. As a result of these circumstances, it may be impossible to ascertain the exact amount of income earned during the life of the decedent; yet, these difficulties should not result in exempting all of such income from taxation.

In construing the predecessor of section 691, the Supreme Court held in *Helvering v. Enright*, 312 U.S. 636 (1941), that the fact that the exact amount earned by the decedent cannot be determined should not frustrate the provision; the Court said at page 645:

The completion of the work in progress was necessary to fix the amount due but the right to payment for work ordinarily arises on partial performance. Accrued income under § 42 for uncompleted operations includes the value of the services rendered by the decedent, capable of approximate valuation whether based on the agreed compensation or on quantum meruit. * * *

Similarly, when a court is convinced that a taxpayer is entitled

---

[2]Here, we are not dealing with the sale of an indivisible product, such as a house or a building, which was partially completed before the death of the decedent; nor are we dealing with a situation in which none of the product was to be delivered before the death of the decedent. I express no opinion concerning the applicability of sec. 691 in such situations.

to a deduction, it is generally not denied him merely because he cannot establish the precise amount thereof. *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930); *Merians v. Commissioner*, 60 T.C. 187 (1973). A similar approach should have been adopted in this case.

DRENNEN, DAWSON, TANNENWALD, and CHABOT, *JJ.*, agree with this concurring opinion.